

**FILED**

Mar 25 2015, 10:01 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Ellen M. O'Connor
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEY FOR APPELLEE

Gregory F. Zoeller
Attorney General

Christina D. Pace
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Larry Bell,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff* | March 25, 2015<br><br>Court of Appeals Case No.<br>49A05-1405-CR-205<br><br>Appeal from the Marion Superior Court<br><br>The Honorable Kurt Eisgruber, Judge<br><br>Cause No. 49G01-1203-FB-20291 |

**Mathias, Judge.**

[1] Larry Bell ("Bell") was convicted in Marion Superior Court of Class B felony rape and subsequently admitted to being an habitual offender. The trial court sentenced Bell to an aggregate term of twenty-five years of incarceration. Bell appeals and presents one issue, which we restate as whether the trial court committed reversible error in admitting into evidence a statement made by Bell to a police officer.

We affirm.

## Facts and Procedural History

On February 24, 2012, twenty-five-year-old Bell and his stepbrother, sixteen-year-old Cody Semenick ("Semenick"), threw a party at a Marion County hotel room they had rented. Bell provided alcohol and marijuana for the party, and Semenick attempted to convince his female friends to attend. The only girl to respond was Semenick's seventeen-year-old friend, C.M. As the night progressed, Bell, Semenick, and C.M. drank vodka and lemonade and also smoked marijuana. C.M. eventually became so intoxicated that she began to feel sick and started to fall asleep. She awoke vomiting on her sweatshirt and the bed. Bell helped C.M. to the sink, where she vomited again. Bell cleaned the vomit off C.M. with a washcloth and told her that she was "really, really f**ked up." Tr. p. 123. C.M. had a blank look on her face and was having trouble moving her legs, and Bell helped her back to the bed, where she lost consciousness.

C.M. regained consciousness, feeling numb and nauseous, and began to vomit again, as Bell wiped the vomit from her face. Bell sat behind C.M. and attempted to pull her pants down, but C.M. pulled them back up. Semenick left the room to call his girlfriend because the smell of the vomit made him ill. As he walked out of the room, C.M. was lying on her back with her eyes only half opened and appeared to be "nodding off." Tr. p. 274. After five or ten minutes in the hallway, Semenick attempted to reenter the hotel room, but the door was locked. He knocked on the door, but no one answered.

[5] Inside the locked hotel room, C.M. awoke again to find Bell on top of her with his penis inserted into her vagina as she drifted in and out of consciousness. Bell was naked, and C.M.'s pants and underwear had been removed. She felt around the bed for her clothes but could not find them, then once again lost consciousness. When C.M. regained consciousness again, she was lying on her stomach while Bell had sexual intercourse with her. C.M. told Bell that she was going to be sick again and needed to get up. Bell told her that she was fine, but C.M. told him again that she needed to get up. Bell then stopped having sex with her and let her up. C.M. grabbed her clothes and prepared to leave.

[6] C.M. was still dizzy, and her vision was blurry. Bell asked her if she needed a ride. C.M. stated that she did not need a ride and informed Bell that she was phoning for help. As C.M. prepared to leave the room, Bell asked her, "So you didn't want this?" Tr. p. 133. C.M. stated, "No," to which Bell responded, "Oh, I'm really sorry. My bad. I didn't know." *Id.* He also told C.M. that he thought she had wanted to have sex. Bell then asked C.M. if she was going to get him "in trouble." *Id.* Afraid that Bell might not let her leave, C.M. stated "No." *Id.* Bell later told Semenick that he had sex with C.M. but that during the intercourse, C.M. told Bell that she did not want to have sex. Bell told Semenick that C.M. was "crazy," and told him not to talk to her anymore. *Id.* at 283. Bell later stated, "if anybody asks, just [I] wasn't there, and nothing happened that night." *Id.* at 286.

[7] After C.M. left the hotel, she felt sleepy, nauseous, and achy. C.M. called a friend to give her a ride. C.M.'s friend heard her crying on the telephone before

she even began to speak. When C.M. entered her friend's car, she told her friend what had happened. C.M.'s friend drove her to the hospital, where she was examined by forensic nurse Lisa Nickle ("Nickle"). Nickle conducted a forensic exam on C.M. and observed that C.M. had visible bruising on her vaginal wall, abrasions inside the vaginal canal, and redness inside the vaginal vault. Nickle testified that it appeared forceful contact had occurred with the cells inside C.M.'s vagina, which she explained is more consistent with non-consensual sex than with consensual sex.

[8]     Cervical and vaginal swabs from C.M. were tested for DNA. The results of the DNA testing revealed a combination of DNA from two different individuals: C.M. and Bell. DNA testing of sperm cells found in C.M.'s vagina also matched Bell's DNA profile.

[9]     The subsequent police investigation confirmed that Bell had rented the room at the hotel. The condition of the hotel room was consistent with C.M.'s version of events. Specifically, the police found a vodka bottle, a marijuana blunt, and lemonade. The bedding was also unkempt and stained with vomit.

[10]    The State charged Bell on March 29, 2012 with Class B felony criminal deviate conduct and Class B felony rape. With regard to the rape charge, the State alleged that Bell knowingly had sexual intercourse with C.M. when C.M. was unaware that the sexual intercourse was occurring. *See* Appellant's App. p. 44; Ind. Code § 35-42-4-1.[1]  The State later alleged that Bell was an habitual

---

[1]We refer to the version of the statute that was in effect at the time Bell committed the offense.

offender. When Bell failed to appear at a pre-trial conference on January 31, 2013, the trial court issued a warrant for his arrest. Bell was eventually found on May 21, 2013, living under an alias in Michigan.

[11] The trial court held a jury trial on March 10 and 11, 2014. At trial, part of Bell's strategy was to argue that he did not know that C.M. was unaware that the sexual intercourse was occurring. During the State's case-in-chief, the trial court admitted into evidence, over Bell's objection, testimony from a Deputy Sheriff from Michigan, Lieutenant Jay Olejniczak ("Lt. Olejniczak") that Bell had told him that Bell "could judge a person, read a person basically, he was a people's person, and he could read a person by the way they acted, by the way they looked, by their actions." Tr. p. 433. The jury acquitted Bell of criminal deviate conduct but found him guilty of rape. Bell later admitted to being an habitual offender. On April 11, 2013, the trial court held a sentencing hearing and imposed the advisory ten-year sentence on the rape conviction to which the court added a fifteen-year habitual offender enhancement, for an aggregate term of twenty-five years incarceration. Bell now appeals.

## Discussion and Decision

[12] Bell claims that the trial court erred in the admission of certain evidence. The decision to admit or exclude evidence is within the discretion of the trial court, and this decision is afforded great deference on appeal. *Taylor v. State*, 841 N.E.2d 631, 634 (Ind. Ct. App. 2006). Accordingly, we review the trial court's decision for an abuse of this discretion. *See id.* An abuse of discretion occurs where the trial court's decision is clearly against the logic and effect of the facts

and circumstances before it, or if the court misinterprets the law. *Id.* At issue here is the trial court's admission into evidence of his statement to Lt. Olejniczak wherein Bell claimed that he was good at "reading" people.

## A. Hearsay

[13]   Bell first claims that his statement was inadmissible hearsay because it was not a statement against interest. Hearsay is defined by rule as "(1) a statement that is not made by the declarant while testifying at trial or hearing; and (2) is offered in evidence to prove the truth of the matter asserted." Ind. Evidence Rule 801(c); *see also Amos v. State*, 896 N.E.2d 1163, 1168 (Ind. Ct. App. 2008). Hearsay is generally inadmissible. *Amos*, 896 N.E.2d at 1168 (citing Ind. Evidence Rule 802). One of the exceptions to the hearsay rule is that a statement made by an unavailable person that was a statement against his interests that would "expose the declarant to civil or criminal liability" is admissible. Ind. Evidence Rule 804(b)(3).

[14]   Bell's claim under Evidence Rule 804(b)(3) is misplaced. His statement to Lt. Olejniczak falls under Evidence Rule 801(d), which states that a statement by a party opponent, such as Bell, is specifically not hearsay. Because Bell's statement is by definition not hearsay, it is unnecessary for us to determine whether the exception to the hearsay rule under Rule of Evidence 804(b)(3) applies. *See Myers v. State*, 887 N.E.2d 170, 185 (Ind. Ct. App. 2008) (declining to address defendant's claim that his statement was not against his penal interest because it was a statement of a party opponent and therefore not hearsay).

## B. Relevance

Bell next claims that his statement to Lt. Olejniczak was irrelevant. Evidence Rule 402 provides that relevant evidence is generally admissible and irrelevant evidence inadmissible. However, the threshold for relevance is set rather low by Evidence Rule 401, which provides that evidence is relevant if "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Here, one of the main issues at trial was whether Bell knew that C.M. was so incapacitated as to be unaware that sexual intercourse was occurring.[2] Bell's statement that he could "read a person by the way they acted" had at least some tendency to make it more probable that he knew that C.M. was unaware that sexual intercourse was occurring. We therefore do not agree with Bell that his statement to Lt. Olejniczak was irrelevant.

## C. Danger of Unfair Prejudice

Still, even otherwise relevant evidence may be inadmissible "if its probative value is substantially outweighed by a danger of . . . unfair prejudice[.]" Ind. Evidence Rule 403. Evaluation of whether the probative value of an evidentiary matter is substantially outweighed by the danger of unfair prejudice is a discretionary task best performed by the trial court. *Bryant v. State*, 984 N.E.2d

---

[2] Although the term "unaware" is not defined in the rape statute, we have held that the term means "not aware: lacking knowledge or acquaintance; Unconscious." *Glover v. State*, 760 N.E.2d 1120, 1124 (Ind. Ct. App. 2002) (citing *Becker v. State*, 703 N.E.2d 696, 698 (Ind. Ct. App. 1998); Webster's Third New International Dictionary 2483 (1986 ed.)). A person is unconscious, and therefore unaware, if that person is asleep. *Id*. "Moreover, it is the general, if not universal, rule that if a man has intercourse with a woman while she is asleep, he is guilty of rape because the act is without her consent." *Id*. (citing *Becker*, 703 N.E.2d at 698).

240, 249 (Ind. Ct. App. 2013), *trans. denied*. When determining any unfair prejudicial impact, courts should look for the dangers that the jury will substantially overestimate the value of the evidence or that the evidence will arouse or inflame the passions or sympathies of the jury. *Duvall v. State*, 978 N.E.2d 417, 428 (Ind. Ct. App. 2012).

[17] Here, the probative value of Bell's statements may not have been overwhelming, but neither was the danger of unfair prejudice. In fact, we are unable to see how any danger of unfair prejudice existed in the admission of Bell's out-of-court statement to Lt. Olejniczak, in which Bell merely bragged that he was good at "reading" people. This characteristic is not a negative one that might unfairly prejudice the jury against Bell. The fact that the statement may have been damaging to Bell's defense theory is not grounds for exclusion of the statement. *See Duvall*, 978 N.E.2d at 428 ("All evidence that is relevant to a criminal prosecution is inherently prejudicial[.]").

*D. Character Evidence*

[18] However, Bell's main argument with regard to the admissibility of his statement to Lt. Olejniczak is that it was improper character evidence. Evidence Rule 404(a) provides that "[e]vidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait." Thus, evidence of Bell's character was inadmissible to prove that he acted in accordance with his character on a particular occasion. However, we do not think that Bell's statement to Lt. Olejniczak constituted "character" evidence.

[19] As explained in by our supreme court in *Malinski v. State*, 794 N.E.2d 1071 (Ind. 2003):

> "Character is a generalized description of a person's disposition, or of the disposition in respect to a general trait, such as honesty, temperance or peacefulness." *United States v. Matias*, 39 Fed. Appx. 550, 552 (9th Cir. 2002) citing John W. Strong, *McCormick on Evidence* (5th ed. 1999). "'Character evidence' is evidence regarding someone's personality traits." Black's Law Dictionary 576 (7th ed. 1999).

*Id.* at 1082. Also, federal District Court Judge Miller has written:

> Wigmore defined character as "the actual moral or psychical disposition, or sum of the traits." Graham defines character as "the nature of a person, his disposition generally, or his disposition in respect to a particular trait." McCormick defines it as "a generalized description of a person's disposition, or of the disposition in respect to a general trait."

Robert Lowell Miller, Jr., *Indiana Evidence* § 404.101 (3d ed. 2014) (citing 1A *Wigmore* § 52, at 1148 (Tillers rev. 1983); 1 *Graham Handbook* § 404:1, at 584 (6th ed. 2006); *McCormick on Evidence* § 195, at 1080 (7th ed.)) (footnotes omitted).

[20] With these definitions of "character" in mind, we cannot say that Bell's statement regarding his ability to "read" people is a statement regarding his character or a character trait. It is instead more of a bragging description of his ability, not his character. Accordingly, the admission of Bell's statement to Lt. Olejniczak was not inadmissible character evidence.

*E. Harmless Error*

Moreover, even if we were to agree with Bell that his statement to Lt. Olejniczak was inadmissible, this would not necessarily require us to reverse his conviction. Errors in the admission of evidence are to be disregarded as harmless unless they affect the defendant's substantial rights. *Rogers v. State*, 897 N.E.2d 955, 961 (Ind. Ct. App. 2008) (citing Ind. Trial Rule 61; Ind. Evidence Rule 103(a)). An error will be deemed harmless if its probable impact on the jury, in light of all of the evidence in the case, is sufficiently minor so as not to affect the substantial rights of the parties. *Id.*

Here, the evidence regarding C.M.'s unawareness of the sexual intercourse was very strong, if not overwhelming. C.M. drank and smoked marijuana to the point she became physically ill, vomited, and began to lose consciousness. Semenick testified that C.M. was so drunk that she was barely able to stand, had a blank look on her face, and was "nodding off." Tr. p. 274. Even Bell himself commented to C.M. that she was "really, really f**ked up." Tr. p. 123. As Bell had sexual intercourse with C.M., she was going in and out of consciousness. C.M.'s injuries were more consistent with non-consensual sex than consensual sex. Also, Bell's actions after the incident suggested that he was attempting to conceal his behavior. All of this evidence strongly supports the conclusion that Bell knew that C.M. was unaware that he was having sexual intercourse with her when she was unconscious. Thus, any error in the admission of Bell's out-of-court statement that he could "read" people would have been harmless, if it was error at all.

## Conclusion

The trial court did not abuse its discretion by admitting into evidence Bell's out-of-court statement that he was able to "read" people. This statement was not hearsay because it was the statement of a party opponent, namely Bell himself. It was relevant and not unfairly prejudicial. Nor was Bell's statement inadmissible character evidence. Lastly, even if we agreed with Bell that the statement was inadmissible, any error in the admission of the statement would have been harmless given the evidence regarding C.M.'s inability to be aware that Bell was engaging in sexual intercourse with her.

Affirmed.

Najam, J., and Bradford, J. concur.