## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

May 21 2019, 9:24 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Nathan D. Meeks
Marion, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Marjorie Lawyer-Smith
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Randy N. McKinney,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

May 21, 2019

Court of Appeals Case No.
18A-CR-2573

Appeal from the Grant Superior
Court

The Honorable Dana J.
Kenworthy, Judge

Trial Court Cause No.
27D02-1712-F1-6

**Robb, Judge.**

# Case Summary and Issues

Following a jury trial, Randy McKinney was convicted of one count of child molesting as a Level 1 felony and one count of child molesting as a Level 4 felony. McKinney appeals his convictions, raising one issue for our review which we expand and restate as two: 1) whether the trial court committed fundamental error in admitting into evidence a videotaped interview with the child; and 2) whether the evidence is sufficient to support his convictions. Concluding that there was no fundamental error in the admission of evidence because the error was invited and that there was sufficient evidence to support the convictions, we affirm.

# Facts and Procedural History

S.L., who was six years old at the time of McKinney's trial, is part of a large blended family. She lives with her mother, Ashley, and her stepfather, Jason, and has both step- and half-siblings, some of whom live in Ashley and Jason's home and some of whom live elsewhere. McKinney is Jason's father and at the time of the events leading to this case he resided with Jason's mother, Mary. Ashley and Jason's children frequently went to McKinney and Mary's house and "were excited to go over and see 'em." Transcript of Evidence, Volume 2 at 68. S.L. in particular was "just stoked. She absolutely adores her grandmother." *Id.* at 70-71.

In the early morning hours of July 27, 2017, Ashley's oldest son, Ruben, returned home bleeding from large gashes on his arm and said he had been stabbed. Ashley drove Ruben to the hospital and had to take S.L. and three of S.L.'s siblings with her. Mary worked night shift – 6:00pm to 6:00am. When Mary got off work that morning, S.L. and the other children went to her house. By afternoon, two of S.L.'s siblings had gone to their other grandmother's house and Ashley or Jason had picked up their youngest son who has special needs to take him with them to the hospital, leaving only S.L. at Mary and McKinney's house. When Mary had to go to work, she left S.L. with McKinney. Prior to this, McKinney had never been alone with the children for more than fifteen or twenty minutes. While Mary was gone, S.L. was writing on some blank paper in an upstairs room when McKinney came into the room and asked her, "Will you be bad?"

> [A]nd then I said no, and I thought he was joking for a minute, but, um, he, he was, he was just – um, he was not faking, but and then, um, he said, "Will you be bad?" and then I said no, and then he said, "You can't write then," and then I said, "I'll be bad," but I asked, I didn't be bad and then he trusted me that I will be bad but I didn't really be bad. I just wrote and then just watched t.v.
>
> * * *
>
> [W]hen I was watching t.v. there, um, he said, "You can't watch t.v. if you be bad," and then he kept interrupting me and then when I was watching a movie – but, I mean, he kept turning it off and I don't remember the rest.

*Id.* at 19, 21. Mary left work at midnight and returned home. S.L. was asleep and Mary asked McKinney to help move her to the spare bedroom. McKinney was unwilling to help, although he eventually did "just grab[] her by the arms . . . and he just kind of just flung her on the bed[.]" *Id.* at 143. Mary assumed McKinney was put out about having to watch S.L. that evening, although he had agreed to do so. When Ashley came to pick up S.L., McKinney "freaked out [and] just said, 'Why is this happening?'" *Id.* at 147. When Mary questioned him about his outburst, he said, "I just really am tired of the kids coming over." *Id.* at 148. Jason noticed that S.L. was not as "rambunctious" as she normally is when she returned home. *Id.* at 118.

[4] On August 12, 2017, Mary texted Ashley and asked if S.L. wanted to go to a pool party with her. Ashley asked S.L. if she wanted to go to "Grandma Mary's" and S.L. became "hysterical, screaming[,]" and eventually told Ashley why she did not want to go. *Id.* at 74-75. S.L. said she did not want to go "[b]ecause of my grandpa[;] [b]ecause he, he always be's mean." *Id.* at 20. Ashley told Jason what S.L. had told her and they called the Department of Child Services ("DCS") hotline. Kelly Scott with DCS arranged an interview with S.L. at the Child Advocacy Center that same day and also arranged a medical examination at the Sexual Assault Treatment Center for a later date. During the Child Advocacy Center interview, S.L. indicated that her grandpa had touched her privates with his hand over her underwear and then, with her underwear pulled down, had touched her on both the outside and inside of her privates. Jason called his mom and told her of the accusations S.L. had made,

and when Mary asked McKinney for an explanation, he replied, "I didn't touch that kid." *Id.* at 152.

[5] Leslie Cook, a sexual assault nurse examiner, examined S.L. at the Sexual Assault Treatment Center on August 16, 2017. Cook explained to S.L. "this is who I am, this is what I do, . . . making sure that that child understands what my role is[,]" and recorded in her report that S.L. understood Cook was a nurse and that she was there for a medical examination. *Id.* at 45. S.L. provided a history of what had happened to her, stating that "Grandpa . . . touched my private with his whole hand on skin and on top of underwear." *Id.* at 49. She said it happened more than one time, made her "private feel bad" and she "could feel touching on the outside and inside where I wipe." *Id.* Cook established that S.L. uses the term "private" for the female sex organ and Cook felt S.L. was "very clear" that when she said McKinney touched her "where I wipe," she meant inside the female sex organ. *Id.* at 50. Cook's examination found no evidence of sexual assault, but she did not expect it to since the event occurred approximately three weeks prior. Nonetheless, she concluded S.L. gave a "clear history of multiple events of fondling of her female sex organ; and digital penetration of her female sex organ[.]" Exhibits Volume, Volume 4 at 59.

[6] The State charged McKinney with one count of child molesting as a Level 1 felony and one count of child molesting as a Level 4 felony. At the jury trial, S.L. testified that something "[s]ort of" happened while she was alone with McKinney, but "I don't remember, really remember it." Tr., Vol. 2 at 19, 21.

Later during the State's case in chief, the State informed the court during a sidebar outside the presence of the jury that "there is a stipulation that we will play the [Child Advocacy Center] video . . . as a recorded recollection under 803(5) I believe." *Id.* at 103. McKinney's counsel stated, "[C]orrect, Judge. I . . . think for the record I – the State would need to recall the witness . . . unless we did stipulate. Now, . . . no one wants to do that to [S.L.], so we're agreeing to do that for these purposes[.]" *Id.* When the jury returned to the courtroom, the following discussion was had:

> [The State]: Your Honor, by stipulation, . . . we, the State and the defense are agreeing to play the Child Advocacy Center interview with [S.L.] in lieu of having to bring her back and present live testimony. . . . Is that, is that an accurate representation?
>
> [Defense Counsel]: That, that is. We both agree to play that, Judge. Absolutely.

*Id.* at 104. The jury found McKinney guilty as charged, and the trial court sentenced him to a total of forty-five years. McKinney now appeals his convictions.

# Discussion and Decision

## I. Admission of Evidence

McKinney challenges the admission of the videotape of S.L.'s interview with the Child Advocacy Center as erroneous because it was hearsay and defeated

his right to confront and cross-examine witnesses against him. Generally, decisions regarding the admission of evidence are entrusted to the sound discretion of the trial court. *Bell v. State*, 29 N.E.3d 137, 141 (Ind. Ct. App. 2015), *trans. denied*. We review the trial court's decision only for an abuse of this discretion. *Id*. The trial court abuses its discretion only if its decision is clearly against the logic and effect of the facts and circumstances before it, or if the court misinterprets the law. *Id*.

[8] However, McKinney concedes that he did not make a contemporaneous objection to the admission of the evidence he now claims was improperly admitted. A contemporaneous objection is required to preserve evidentiary error on appeal, and the failure to timely object ordinarily forfeits the issue for purposes of appellate review. *Hastings v. State*, 58 N.E.3d 919, 922 (Ind. Ct. App. 2016). To avoid this waiver, McKinney argues that the admission of the videotape was fundamental error.

[9] A claim that has been forfeited by a defendant's failure to raise a contemporaneous objection can nonetheless be reviewed on appeal if the reviewing court determines that a fundamental error occurred. *Brown v. State*, 929 N.E.2d 204, 207 (Ind. 2010). Fundamental error allows us to "address an error that made a fair trial impossible or constituted a clearly blatant violation of basic and elementary principles of due process presenting an undeniable and substantial potential for harm[.]" *Brewington v. State*, 7 N.E.3d 946, 974 (Ind. 2014) (internal quotations and alterations omitted). "A finding of fundamental error essentially means that the trial judge erred . . . by not acting when he or

she should have, even without being spurred to action by a timely objection."
*Id.* (internal quotation omitted). Here, however, McKinney not only failed to
object to the admission of the videotape but actively stipulated to its admission.
This is, therefore, a case of invited error, as it was not simply a passive lack of
objection that could possibly have required the trial judge to take action *sua
sponte* but an affirmative action on McKinney's part to agree to the admission of
evidence he now alleges should not have been admitted. Invited error forbids a
party from "taking advantage of an error that she commits, invites, or which is
the natural consequence of her own neglect or misconduct." *Durden v. State*, 99
N.E.3d 645, 651 (Ind. 2018) (internal quotation omitted); *cf. Batchelor v. State*,
119 N.E.3d 550, 558 (Ind. 2019) (noting care must be taken to ensure the record
demonstrates "the error resulted from the appellant's affirmative actions as part
of a deliberate, well-informed trial strategy") (internal quotation omitted).
Whether or not it was error to admit the videotape, it was invited error, and
invited error is not reversible error. *See Kingery v. State*, 659 N.E.2d 490, 494
(Ind. 1995).

## II. Sufficiency of the Evidence

[10] When reviewing the sufficiency of the evidence required to support a criminal
conviction, we do not reweigh the evidence or judge the credibility of the
witnesses. *Bailey v. State*, 907 N.E.2d 1003, 1005 (Ind. 2009). We consider only
the evidence supporting the verdict and any reasonable inferences that can be
drawn therefrom. *Morris v. State*, 114 N.E.3d 531, 535 (Ind. Ct. App. 2018),
*trans. denied.* Thus, we consider conflicting evidence most favorably to the

verdict. *Silvers v. State*, 114 N.E.3d 931, 936 (Ind. Ct. App. 2018). "We will affirm if there is substantial evidence of probative value such that a reasonable trier of fact could have concluded the defendant was guilty beyond a reasonable doubt." *Bailey*, 907 N.E.2d at 1005. It is not necessary for the evidence to overcome every reasonable hypothesis of innocence; it is sufficient if an inference may reasonably be drawn from the evidence to support the verdict. *Silvers*, 114 N.E.3d at 936.

[11]  McKinney was charged with two counts of child molesting, one count as a Level 1 felony for "knowing[ly] or intentionally perform[ing] other sexual conduct, to wit: an act involving the penetration of S.L.'s sex organ with [his] finger;" and one count as a Level 4 felony for "perform[ing] fondling or touching of S.L., with the intent to arouse or to satisfy the sexual desires of himself or S.L." Appellant's Appendix, Volume II at 13. Child molesting is committed by:

> (a) A person who, with a child under fourteen (14) years of age, knowingly or intentionally performs or submits to sexual intercourse or other sexual conduct . . . . [T]he offense is a Level 1 felony if . . . it is committed by a person at least twenty-one (21) years of age[.]
>
> * * *
>
> (b) A person who, with a child under fourteen (14) years of age, performs or submits to any fondling or touching, of either the child or the older person, with intent to arouse or to satisfy the sexual desires of either the child or the older person[.] [The offense is] a Level 4 felony.

Ind. Code § 35-42-4-3(a)(1), (b). "Other sexual conduct" is defined as an act involving "the penetration of the sex organ . . . of a person by an object." Ind. Code § 35-31.5-2-221.5(2).

[12] We agree with McKinney that S.L. did not clearly state in her testimony that McKinney touched her at all, let alone inappropriately. Nonetheless, the fact that something inappropriate occurred could be inferred from her testimony that McKinney came into a room where she was writing and asked her if she would "be bad" and when she said no, McKinney told her she could not write so she agreed. Tr., Vol. 2 at 18-19. The fact that she claimed not to remember more is unsurprising when considering the situation in which her somewhat cryptic testimony was given – in a courtroom setting with McKinney present. But S.L. made clear and consistent statements in her Child Advocacy Center interview and during her examination at the Sexual Assault Treatment Center that McKinney touched her both inside and outside her female sex organ. McKinney's argument is largely premised on the admission of the Child Advocacy Center interview being erroneous, a claim which we have disposed of above. And McKinney does not specifically challenge the testimony about S.L.'s statements at the medical examination.[1] Thus, the cumulative statements

---

[1] We note that even if we were to not consider the Child Advocacy Center interview, the statements S.L. gave there are almost identical to those she gave during her examination at the Sexual Assault Treatment Center, and the result would be the same.

made by S.L. and heard by the jury are sufficient evidence from which the jury could conclude that McKinney touched S.L. inappropriately.

[13] McKinney also claims there is no evidence of his intent. "The intent element of child molesting may be established by circumstantial evidence and may be inferred from the actor's conduct and the natural and usual sequence to which such conduct usually points." *Bowles v. State*, 737 N.E.2d 1150, 1152 (Ind. 2000). As there was no "innocent" reason for McKinney to touch S.L.'s "privates," such as helping her bathe or go to the bathroom, his intent to touch her in a sexual way may be inferred.

[14] "The balance between understanding what quite young children are telling us and ensuring that convictions are based on sufficient evidence is not easy to achieve. At least to some extent, concluding what a child is communicating is a matter of weighing the evidence [which] we cannot do on appeal." *Smith v. State*, 779 N.E.2d 111, 116 (Ind. Ct. App. 2002), *trans. denied*. The evidence as a whole, construed in the light most favorable to the verdict, supports McKinney's convictions for child molesting.

# Conclusion

[15] McKinney invited any error in the admission of the Child Advocacy Center interview by agreeing to its admission. Considering all the available evidence in the light most favorable to the verdict, we conclude there was sufficient evidence to support McKinney's two convictions of child molesting.

Affirmed.

Baker, J., and Najam, J., concur.