

FILED

Aug 14 2020, 8:51 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Kevin Wild
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

J.T. Whitehead
Deputy Attorney General
Indianapolis, Indiana

IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Kenneth Lancaster,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff* | August 14, 2020<br><br>Court of Appeals Case No.<br>19A-CR-2970<br><br>Appeal from the Marion Superior<br>Court<br><br>The Honorable Mark D. Stoner,<br>Judge<br><br>Trial Court Cause No.<br>49G06-1802-MR-6370 |

**Baker, Senior Judge.**

[1] Kenneth Lancaster appeals following his convictions for three counts of Murder.[1] He argues that the trial court erred by admitting certain evidence and that the evidence is insufficient to support his convictions. He also argues that the trial court erred by using an improper aggravator and declining to find a proffered mitigator. Finding no reversible error and sufficient evidence, we affirm.

## Facts

[2] In 2017, Lancaster was a known heroin dealer who sold heroin to his buyers from a rotating series of locations. He was known to carry a nine-millimeter semi-automatic gun with an extended clip. If buyers were low on money, they could purchase heroin from Lancaster by providing him with the title to an automobile, providing work on an automobile, or doing other odd jobs.

[3] One of Lancaster's buyers was Jessica Carte, who lived with her boyfriend, Keith Higgins, and Keith's parents, Mark and Teresa Higgins. Jessica often drove Keith's red Monte Carlo, sometimes using it to drive to heroin buys. Sometimes Jessica used her own cell phone and sometimes she used Keith's cell phone to contact Lancaster about purchasing heroin. In the weeks leading up to June 1, 2017, Jessica's phone contacted Lancaster's sixteen times and Keith's phone contacted Lancaster's forty times.

---

[1] Ind. Code § 35-42-1-1.

[4] In May 2017, Tony Leonard overheard Lancaster's brother say to Lancaster, "[w]e need to smoke Jessica," meaning to kill her. Tr. Vol. IV p. 181. Lancaster replied, "If we do her, we'll have to do them all." *Id.* at 182.

[5] At some point, Lancaster had given Jessica money so that she could make regular car payments on one of his vehicles. On the night of May 31, 2017, the car was repossessed because Jessica had not made timely payments. Lancaster became angry and said he was going to "get a hold of this b*tch and find out what the f*ck is going on with this car. It's my money." Tr. Vol. III p. 35. Jessica arrived at Lancaster's home about fifteen minutes later, driving the Monte Carlo. Andrew Kelley, one of Lancaster's other heroin buyers, was outside the house for about half an hour. Kelley heard one of the occupants of the house beating Jessica. He entered the house and saw Jessica tied up with electrical cords. Later, Lancaster, Jessica, and two other people drove away in the Monte Carlo.

[6] Kelley stayed at Lancaster's home and slept in a vehicle outside. Sometime between 6:30 and 7:00 a.m. on June 1, 2017, one of the people with Lancaster called Kelley and told him to get some lighter fluid and bring it to them. He followed their directions and found the group, absent Jessica and without the Monte Carlo, sometime after 7:00 a.m. Kelley noticed that the group was unusually quiet. At some point, Lancaster's brother told Kelley to "burn the car good." Tr. Vol. II p. 48. Kelley never burned a car.

[7] Earlier on the morning of June 1, the Higgins household began its morning routine as usual. Teresa woke up at 4:00 a.m. and left for work at 5:15 a.m. Mark woke up and moved his truck so that Teresa could leave. He drank his coffee and got ready to leave for work; he always left for work at 7:30 a.m. Later that morning, James Blankenship—Mark and Teresa's son-in-law—went to check on Mark because he had not gone to work or called in an absence, which was very atypical.

[8] When James arrived at the house, Mark's truck was still in the driveway. James found the front door slightly ajar and he entered the house. In the dining room, he found Mark, who was face-down with a bullet hole in the back of his head. James found no signs of life and immediately called 911. The police arrived within two minutes and searched the rest of the home, finding the bodies of Jessica and Keith as well. All three died as a result of multiple gunshot wounds.[2]

[9] Officers recovered numerous bullets, fragments, and fired cartridge cases. A firearms specialist confirmed that of the three to four weapons used, one was a semi-automatic nine-millimeter gun. At some point, police found the Monte Carlo, which had been abandoned.

---

[2] Jessica had seven gunshot wounds; Keith had twelve; and Mark had two.

[10] Police eventually began to focus on Lancaster. Over the course of their investigation, they learned of the following statements made by Lancaster in the days following the murders:

- Tammy Botkins overheard Lancaster and his brother talking about the murders after seeing a news report. Lancaster said, "we are fine, there's nothing, there was nothing mentioned about it on the news." Tr. Vol V p. 29. Botkins also heard Lancaster say, "[s]he should have planned her funeral arrangements when she took my money." *Id.* at 30.
- Lancaster told Kelley, "I beat three M's." Tr. Vol. III p. 51, 58. The morning after the murders, Lancaster said, "[t]hat old man didn't have money anyways." *Id.* at 49.
- After Wayne Curtis was hospitalized in an unrelated assault, he asked Lancaster what might happen to his attackers. Lancaster responded, "[w]e already killed three . . . motherf*ckers already." Tr. Vol. IV p. 131. Lancaster later spoke again with Curtis, telling him he still remembered the look in Jessica's eyes before she died and stating that he had killed Jessica and Keith.
- Lancaster told Ronnie Clontz that Jessica "got what she deserved and that he won't be stolen from," telling Clontz that he shot his victims "execution style." *Id.* at 224-25. Lancaster said that Mark and Keith were there and "they got what they needed too." *Id.* at 225.

Surveillance video of the abandoned Monte Carlo revealed to the police that they were looking for four suspects. Between all the witnesses interviewed, police were able to identify Lancaster as well as his three accomplices.

[11] Law enforcement sought and obtained a search warrant for Lancaster's DNA. When officers attempted to execute the warrant, the detective did not inform Lancaster that he was investigating the murders or that he was a homicide detective. But upon learning that the detective had a warrant and intended to

take a DNA sample, Lancaster said, "I didn't hurt those people." Tr. Vol. V p. 38.

[12] On February 23, 2018, the State charged Lancaster with three counts of murder. The jury trial began on October 2, 2019. At the trial, the State sought to present the testimony of Leonard, who had overheard Lancaster and Lancaster's brother talk about killing Jessica before the murders occurred. Lancaster objected and the trial court overruled his objection, permitting Leonard to testify.

[13] At the close of the trial, the jury found Lancaster guilty as charged. On November 15, 2019, the trial court sentenced Lancaster to consecutive terms of 60, 55, and 55 years, for an aggregate sentence of 170 years. Lancaster now appeals.

# Discussion and Decision

## I. Admission of Evidence

[14] Lancaster first argues that the trial court erred by permitting Leonard to testify about the conversation he overheard between Lancaster and Lancaster's brother. The trial court has broad discretion to admit or exclude evidence, and we will reverse only if the trial court's decision is clearly against the logic and effect of the facts and circumstances before the court or if the court misinterpreted the law. *E.g.*, *Minor v. State*, 36 N.E.3d 1065, 1070 (Ind. Ct. App. 2015).

[15] The testimony in question was Leonard's recounting of the conversation he overheard between Lancaster and Lancaster's brother. Lancaster's brother said to Lancaster, "[w]e need to smoke Jessica," meaning to kill her. Tr. Vol. IV p. 181. Lancaster replied, "If we do her, we'll have to do them all." *Id.* at 182.

[16] The trial court admitted the first statement, made by Lancaster's brother, because it found that it constituted an adoptive admission. An adoptive admission, which is not hearsay, is a statement offered against an opposing party that "the party manifested that it adopted or believed to be true[.]" Evid. R. 801(d)(2)(B). This Court has noted that "Indiana law on adoptive admissions since the adoption of the Indiana Rules of Evidence is scarce, but Indiana's rule is identical to Federal Rule of Evidence 801(d)(2)(B), and we may use federal cases for guidance." *Irmscher Suppliers, Inc. v. Schuler*, 909 N.E.2d 1040, 1046-47 (Ind. Ct. App. 2009). The federal rule governing adoptive admissions "does not require the party to specifically adopt another person's statements, but a 'manifestation of a party's intent to adopt another's statements, or evidence of the party's belief in the truth of the statements, is all that is required for a finding of adoptive admission.'" *Id.* at 1047 (quoting *United States v. Rollins*, 862 F.2d 1282, 1296 (7th Cir. 1988)).

[17] Here, after Lancaster's brother stated that they needed to "smoke Jessica," Lancaster did not deny, disagree with, or refute the statement, and even went a step further, saying that they would "have to do them all." Tr. Vol. IV p. 181-82. Under these circumstances, we find that the trial court did not err by

finding that the statement of Lancaster's brother was admissible as an adoptive admission.

[18] The second statement, made by Lancaster, is plainly admissible. It is not hearsay because it was a statement made by a party opponent (Lancaster) and was offered by the State against that party. Ind. Evid. Rule 801(d)(2)(A). Therefore, the trial court did not err by admitting this portion of Leonard's testimony. *Bell v. State*, 29 N.E.3d 137, 143 (Ind. Ct. App. 2015) (holding that it was not error to admit into evidence defendant's out-of-court statement).[3]

## II.  Sufficiency

[19] Next, Lancaster argues that the evidence is insufficient to support his three murder convictions. In reviewing a challenge to the sufficiency of evidence supporting a conviction, we neither reweigh the evidence nor assess witness credibility and will consider only the probative evidence and reasonable inferences supporting the verdict. *McHenry v. State*, 820 N.E.2d 124, 126 (Ind. 2005). We will affirm if the probative evidence and reasonable inferences could have allowed a reasonable factfinder to find the defendant guilty beyond a reasonable doubt. *Id.*

[20] To convict Lancaster of murder, the State was required to prove beyond a reasonable doubt that he knowingly or intentionally killed Jessica, Keith, and

---

[3] While we find no error with respect to the admission of this evidence, we also note that even if error had occurred, it would have been harmless given the wealth of independent evidence supporting Lancaster's guilt.

Mark.  I.C. § 35-42-1-1.  Lancaster argues that the evidence does not prove beyond a reasonable doubt that he was involved.  He emphasizes that no one saw him commit the crimes, no one saw him at the scene where they occurred, and no one saw him going to or coming from the scene.  There was also no specific physical evidence placing Lancaster at the scene or connecting him to the crimes.

[21]     While Lancaster may be correct as to what was not contained in the State's evidence, he ignores the evidence that was offered to support his guilt.  Among other things, the record contains the following evidence:

- Lancaster knew Jessica and knew where she lived.  He had a motive to kill her—namely, his belief that she had stolen money from him by failing to make payments on a car.  In the weeks leading up to the murders, there were over fifty contacts between Lancaster's cell phone and the cell phones of Jessica and Keith (which Jessica used at times to communicate with Lancaster).
- The night before the murders, Lancaster contacted Jessica about the money she had misspent, and she came to his house and was tied up with electrical cords and beaten.  The last time she was seen alive was when she, Lancaster, and other individuals drove away from Lancaster's house together.
- In the days and weeks following the murders, Lancaster admitted to multiple people at different times that he had killed the victims.
- When a detective executed a warrant for Lancaster's DNA but did not explain that he was a homicide detective or that he was investigating murders, Lancaster immediately said, "I didn't hurt those people."  Tr. Vol. V p. 38.
- Firearms analysis established that at least one of the weapons used in the murders was a nine-millimeter semi-automatic gun.  Lancaster was known to carry a nine-millimeter semi-automatic gun.

We find that this evidence, albeit circumstantial, plus the reasonable inferences that can be drawn from the evidence, could lead a reasonable factfinder to find that Lancaster was guilty of the three murders. Lancaster's arguments amount to requests that we reweigh evidence and re-assess witness credibility, which we may not and will not do. The evidence is sufficient to support the convictions.

# III. Sentencing

[22] Finally, Lancaster argues that the trial court erred in the sentencing process by considering an improper aggravator and declining to consider a proffered mitigator.[4] *See Anglemyer v. State*, 868 N.E.2d 482, 490-91 (Ind. 2007), *clarified on reh'g*, 875 N.E.2d 218.

[23] One of the aggravators considered by the trial court was Mark's age:

> Court: Mr. Mark Higgins was I believe—correct me if I'm wrong, State, but I believe the evidence from the witness was that he was over, over the age of 65 at the time? 65 or older?
>
> State: Yes, Your Honor.
>
> Court: So, that's a statutory aggravator. And Mr. Higgins was killed just simply for being a witness. . . . [H]e was simply wrong place, wrong time, innocent bystander . . . .

---

[4] Lancaster does not argue that the sentence is inappropriate pursuant to Indiana Appellate Rule 7(B).

Tr. Vol. V p. 154. In fact, however, Mark was six months shy of turning sixty-five when he was murdered. Strictly speaking, therefore, Lancaster is correct that Mark's age did not qualify as a statutory aggravator, which requires the victim to have been sixty-five years or older at the time of the offense. Ind. Code § 35-38-1-7.1(a)(3). Nonetheless, the trial court could properly have considered Mark's age (as well as his status as an innocent bystander) as part of the heinous nature and circumstances of the crime, and we are confident that if it had done so, it would have imposed the same sentence. Therefore, we find that any error was harmless.

[24] To show that a trial court erred by failing to consider a proffered mitigating circumstance, the defendant must show that the mitigator was both significant and clearly supported by the record. *Anglemyer*, 868 N.E.2d at 493. Lancaster contends that he was merely an accessory and not the principal actor in the murders and that this circumstance should have been found mitigating. The record, however, belies Lancaster's assertion. He boasted that he killed his victims execution style; he said that Jessica's family was present and "they got what they needed too," Tr. Vol. IV p. 225; it was Lancaster's money that was allegedly stolen by Jessica; and Lancaster told at least one person that he had killed all three victims. Therefore, the record does not clearly support a conclusion that Lancaster was merely an accomplice or accessory and the trial court did not err by declining to find this as a mitigator.

[25] The judgment of the trial court is affirmed.

Bailey, J., and Vaidik, J., concur.