**FILED**

Dec 07 2018, 10:47 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEY FOR APPELLANT

Mark K. Leeman
Leeman Law Office
Logansport, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Ian McLean
Supervising Deputy Attorney
General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Jacob Lee Silvers, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff* | December 7, 2018 <br><br> Court of Appeals Case No. <br> 18A-CR-1126 <br><br> Appeal from the Cass Superior Court <br><br> The Honorable James K. Muehlhausen, Judge <br><br> Trial Court Cause No. <br> 09D01-1711-F6-433 |

**Vaidik, Chief Judge.**

## Case Summary

[1]     Jacob Lee Silvers was convicted of several drug-related crimes. He now appeals, arguing that the trial court erred in denying his motion to continue the

trial and that the evidence is insufficient to support two of his convictions. The State concedes that the evidence is insufficient to support one of the convictions. Although we reverse that conviction and remand for resentencing, we affirm the trial court on the other issues.

## Facts and Procedural History

[2] In October 2017, Silvers and Rachelle Gerhart were romantically involved and regularly used drugs together, including heroin, methamphetamine, and marijuana. On October 31, Rachelle, driving her silver Pontiac Grand Am, and Silvers picked up Dustin Ecklebeck, and the trio drove to Kokomo to purchase heroin from Dustin's dealer. After purchasing the heroin, Rachelle and Silvers dropped off Dustin at his house. As they dropped him off, Silvers's mother, Michelle (who was staying at Dustin's house), ran out of the house yelling at them not to leave her because her boyfriend (Scott Powers) had just called the police. Tr. Vol. II p. 193. Silvers ordered Rachelle, who was preparing a needle to inject herself with heroin, to drive away without his mother; however, he changed his mind and told Rachelle to wait on her. When Michelle got in the car, she was "frantic." *Id.*

[3] At about the same time, Cass County Sheriff's Deputy Scott Turney received a dispatch to be on the lookout for a silver Pontiac Grand Am. Shortly thereafter, Deputy Turney passed a silver Pontiac Grand Am. As he passed the car, the three occupants—two females and one male—all stared at him, which was unusual. When Rachelle, Silvers, and Michelle saw the brake lights on the

police car illuminate, Silvers and Michelle ordered Rachelle to "hurry up and go." *Id.* at 194. Deputy Turney radioed another officer in the area, Detective Thomas Heflin, that the Grand Am had just passed him and that he was going to turn around to catch up to it. Detective Heflin positioned himself to intercept the car and waited. Soon thereafter, Detective Heflin observed the Grand Am abruptly pull into a Quonset hut (a semi-circle building made of sheet metal, commonly used during World War II). Detective Heflin pulled in behind the car and activated his emergency lights. Silvers exited the front passenger-side door and fled on foot but was soon apprehended.

[4] The Grand Am was searched, and numerous items were found, including a burnt marijuana cigarette in the front passenger-side door and a blue plastic straw with white residue in the center console (Exhibit 5). Officers also found a Ziploc bag containing brown residue (Exhibit 12) and a spoon (Exhibit 8) in Rachelle's purse as well as a rock of heroin on her person (Exhibit 6). It was later determined that Exhibit 5 contained heroin, Exhibit 6 contained heroin and cocaine, and Exhibit 12 contained heroin. Ex. 18 (lab results).

[5] The State ultimately charged Silvers with Count 1: Level 6 felony possession of cocaine (for the heroin that also contained cocaine, Exhibit 6), Count 2: Class A misdemeanor resisting law enforcement, Count 3: Class B misdemeanor possession of marijuana, Count 4: Class B misdemeanor visiting a common nuisance, Count 5: Class C misdemeanor possession of paraphernalia (straw or spoon), and Count 6: Level 6 felony possession of a narcotic drug (heroin).

[6] Silvers was in the Cass County Jail while awaiting trial. On the morning of March 5, 2018, the day before the jury trial was set to begin, the Cass County jail commander gave the deputy prosecutor an updated recording of Silvers's jail calls on CD. When the deputy prosecutor began listening to the calls, he recognized defense counsel's voice. The deputy prosecutor turned off the recording and went to the Cass County Prosecutor. After consulting the Indiana Prosecuting Attorneys Council, the State requested a hearing, which was held later that day. During the hearing, the deputy prosecutor told the trial court that when he started listening to the first call on the CD, he recognized defense counsel's voice "within a few seconds." Tr. Vol. II p. 5. He then "immediately" stopped the recording and moved on to the second call. He listened to a "few seconds" of that call and again recognized defense counsel's voice. *Id.* He then stopped the recording. The deputy prosecutor told the trial court that he heard "nothing of substance relating to the case" and that he wanted to give the CD, which was the only copy that he was aware of, to the trial court for safekeeping. *Id.* The trial court told the parties that since it had heard nothing that appeared to affect the trial, the matter would be more fully addressed at trial the next day. Later that night, Silvers filed a motion to dismiss the charges based on the State's "outrageous conduct" in recording protected attorney-client conversations. Appellant's App. Vol. II p. 86.

[7] The next day, the parties met for a continued hearing as well as for a hearing on Silvers's motion to dismiss. In addition, Silvers orally requested a continuance so that he could depose the jail commander, "anybody else at the jail that's

listening to these conversations," and "everyone at the prosecutor's office who may have listened to this." Tr. Vol. II p. 15. The State then presented evidence of how conversations are recorded in the Cass County Jail. First, an inmate can place a phone call in the cell pod; these phone calls are recorded (unless the phone call is to an attorney who has asked the jail to have his/her phone number blocked from recording). Second, there is a public visitation room, where visitors can see the inmates through plexiglass and talk to them using a phone; these calls, which are set up for ten minutes, are audio recorded. Last, there is an attorney meeting room where attorneys can privately meet with their clients; these conversations are not audio recorded.

[8] Regarding the specifics of this case, the jail commander testified under oath that on the morning of Monday, March 5, he "pulled" Silvers's calls from Friday through the weekend and gave them to the deputy prosecutor. *Id.* at 32. He verified that the CD was not blank by clicking on the first file. As soon as he heard the advisement that the call may be recorded, he stopped the CD and did not listen to any more. *Id.* at 33, 38. He did not listen to any of the substance of the calls. *Id.* at 39. The assistant jail commander—the only other person with access to the system that records the calls—testified under oath that in helping the prosecutor's office figure out in this case the wording of the advisements for each type of call, he listened to the CD up to the point where the advisement started and then "hit stop." *Id.* at 53. He also did not listen to any of the substance of the calls. *Id.* Defense counsel cross-examined both witnesses. In addition, the State admitted an affidavit from the deputy

prosecutor, who said that he "did not hear anything substantively about the case during the few seconds the recording was played" and that he "stopped the playback immediately upon recognizing the defense attorney was on the call." Ex. 1A. The deputy prosecutor also said that he has "no specific knowledge of any other person listening to the CD in question. Neither [his] co-counsel nor other individuals in the Cass County Prosecutor's Office have listened to the CD." *Id.*

[9] At the end of the hearing, the trial court denied Silvers's motions to dismiss and to continue:

> [The jail commander] and [assistant jail commander] are the only two at the jail that would have had an opportunity to hear it, both of them denied hearing it. [T]hen it was transmitted to [the deputy prosecutor], I have his affidavit saying that he didn't listen to it and nobody else in the Prosecutor's office listened to it. So what's left?

Tr. Vol. II p. 58.

[10] The jury trial then began, and Silvers was found guilty as charged. The day after trial ended, the parties, pursuant to a stipulation reached before the case was submitted to the jury, returned to the courtroom so that the State could introduce evidence to supplement the record regarding the jail recordings. Tr. Vol. III p. 6. According to the stipulation, the evidence was to be treated if it was admitted into evidence at the time the trial court ruled on Silvers's motions to dismiss and to continue. *Id.* at 25-26. The jail commander testified that upon further investigation, he learned that on Friday, March 2, defense counsel

went to the Cass County Jail and asked to speak with Silvers, but the attorney meeting room was in use at the time. *Id.* at 9; Ex. 31 (audio recording of defense counsel talking on a speaker to someone in the control room and asking to speak with Silvers). Defense counsel was told that he would have to use a phone in the public visitation room, and defense counsel agreed to talk to Silvers there. Tr. Vol. III p. 9; Ex. 32 (video of defense counsel meeting Silvers in public visitation room on Friday). Defense counsel then cross-examined the jail commander. Finally, the State admitted Exhibit 30, which is the CD that the jail commander made of Silvers's calls. Tr. Vol. III pp. 8, 15, 24. Defense counsel did not object to the admission of Exhibit 30. Indeed, defense counsel invited the trial court to listen to Exhibit 30. *Id.* at 15 (defense counsel: "what matters is what is on the tape which you have number 30 which was between" defense counsel and Silvers). According to Exhibit 30, there are two calls between Silvers and his attorney in the public visitation room on Friday, March 2: one starting at "14[:]**39**[:]28" and lasting exactly ten minutes (the longest each call can be due to the recording system) and the other starting at "14[:]**49**[:]41" and lasting four minutes. Ex. 30 (emphases added); *see also* Tr. Vol. II p. 45 (deputy prosecutor explaining that the CD contained ten calls, only two of which involved defense counsel).

[11] A sentencing hearing was later held, and the trial court sentenced Silvers to 912 days for Count 1, 365 days for Count 2, 180 days for Count 3, 180 days for Count 4, 60 days for Count 5, and 912 days for Count 6. The court ordered

Counts 1, 2, and 3 to be served consecutive to each other and concurrent to the other counts, for an aggregate term of 1457 days.

[12] Silvers now appeals.

# Discussion and Decision

[13] Silvers raises two issues on appeal. First, he contends that the trial court erred in denying his motion to continue. Second, he contends that the evidence is insufficient to support his convictions on Counts 1 and 5.

# I. Motion to Continue

[14] Silvers first contends that he was "deprived of due process when the trial court denied his motion for a continuance." Appellant's Br. p. 12. Specifically, Silvers argues that although the CD contains two calls between him and his attorney, there was only evidence admitted about one of the calls and therefore he was entitled to a continuance to investigate the second one. Silvers's starting premise that there was only evidence admitted about one of the calls is incorrect. Both the jail commander and the assistant jail commander—the only two people with access to the system—testified that they did not listen to any of the calls on the CD. Silvers vigorously cross-examined both witnesses. The deputy prosecutor also submitted an affidavit, which provided that he did not listen to any substance on the CD and that no one else in the prosecutor's office had listened to the CD at all. Although Silvers was not able to cross-examine the deputy prosecutor, he was able to make argument to the trial court and

respond to the deputy prosecutor's claims. *See* Tr. Vol. II pp. 7-8, 13-15, 22-24; *see also id.* at 7 (defense counsel saying that he believed the deputy prosecutor when he said that did not listen to the calls). Moreover, according to Exhibit 30, defense counsel had only one conversation with Silvers in the public visitation room on March 2. The conversation was broken up into two calls because of the ten-minute time limit imposed by the recording system. In other words, the second call was merely a continuation of the first call. Accordingly, because the circumstances of both calls are the same and these circumstances were fully explored below, Silvers was not entitled to a continuance to investigate the second call.

[15] We share Silvers's concern that the recording procedures at the Cass County Jail allowed a confidential communication between an attorney and his client to be captured and preserved. However, the issue we must decide here is whether the recording prejudiced Silvers. The evidence shows that the deputy prosecutor quickly brought this matter to the attention of the trial court, the incident was explored on three separate occasions below, and there is no indication that anyone listened to the substance on the CD. *Cf. State v. Taylor*, 49 N.E.3d 1019 (Ind. 2016) (addressing police officers' and prosecutor's eavesdropping on a criminal suspect's pre-interrogation consultation with his lawyer—during which they overheard information regarding both evidence and strategy—and declining to adopt a remedy of blanket suppression of the witnesses' testimony). We therefore affirm the trial court.

# II. Sufficiency of the Evidence

Silvers next contends that the evidence is insufficient to support his convictions for Level 6 felony possession of cocaine and Class C misdemeanor possession of paraphernalia. In reviewing the sufficiency of the evidence supporting a conviction, we consider only the probative evidence and reasonable inferences supporting the verdict. *Wilson v. State*, 39 N.E.3d 705, 716 (Ind. Ct. App. 2015), *trans. denied*. We do not reweigh the evidence or assess witness credibility. *Id.* We consider conflicting evidence most favorably to the verdict. *Id.* We will affirm the conviction unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt. *Id.* It is not necessary that the evidence overcome every reasonable hypothesis of innocence. *Id.* The evidence is sufficient if an inference may reasonably be drawn from it to support the verdict. *Id.*

## A. Possession of Paraphernalia

Silvers argues that the evidence is insufficient to prove Class C misdemeanor possession of paraphernalia. In order to convict Silvers of this offense, the State had to prove that he knowingly or intentionally possessed a straw or spoon that he intended to use for introducing a controlled substance into his body. Appellant's App. Vol. II p. 140; *see also* Ind. Code § 35-48-4-8.3(b)(1). Silvers asserts that "there is no evidence he used a straw or spoon to ingest a controlled

substance."[1] Appellant's Br. p. 17. At trial, Rachelle testified that the straw found in the center console (Exhibit 5) was used to snort heroin. Tr. Vol. II p. 209. Indeed, heroin residue was found in the straw. Rachelle also testified that while she preferred to inject her heroin, Silvers snorted his. In fact, Rachelle said that after they purchased the heroin from Dustin's dealer in Kokomo, Silvers "snorted" heroin using a "straw" while she drove. *Id.* at 206. Although it is true that Rachelle couldn't say for certain whether Silvers used Exhibit 5 to snort the heroin, *see id.* at 209, the jury was entitled to believe that he did. In light of all the evidence, it was reasonable for the jury to infer that Silvers intended to use the straw to introduce heroin into his body. We therefore affirm his conviction on Count 5.

## B. Possession of Cocaine

[18] Silvers next argues that the evidence is insufficient to prove Level 6 felony possession of cocaine because "there is no evidence that [he] knew the heroin [that he bought and used] also contained another controlled substance in the mixture." Appellant's Br. p. 16. The State concedes that the evidence does not support this conviction because there is no evidence that Silvers knew the heroin also contained cocaine. Appellee's Br. p. 19. The State asks us to

---

[1] To the extent that Silvers also argues that the evidence is insufficient to prove that he possessed the straw, he has waived this issue for failing to provide a cogent argument supported by citations to the record and authority. *See* Ind. Appellate Rule 46(A)(8)(a). Waiver notwithstanding, we find that the evidence easily supports a finding that Silvers constructively possessed the straw, as it was found in the center console right next to where he was sitting before he ran from the police.

remand this case to the trial court for resentencing on the five remaining counts. *See Kendrick v. State*, 947 N.E.2d 509, 514 (Ind. Ct. App. 2011) (explaining that "where a defendant is sentenced on multiple counts, he has no legitimate expectation of finality in any discrete portion of the sentencing package after a partially successful appeal" (quotation omitted)).  Silvers does not ask for a different remedy.  We therefore remand this case to the trial court for resentencing.

[19]  Affirmed in part, reversed in part, and remanded.

Riley, J., and Kirsch, J., concur.