## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jun 04 2019, 9:10 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ᴀᴛᴛᴏʀɴᴇʏ ғᴏʀ ᴀᴘᴘᴇʟʟᴀɴᴛ

Ronald K. Smith
Public Defender
Muncie, Indiana

ᴀᴛᴛᴏʀɴᴇʏs ғᴏʀ ᴀᴘᴘᴇʟʟᴇᴇ

Curtis T. Hill, Jr.
Attorney General of Indiana

Jesse R. Drum
Supervising Deputy
Attorney General
Indianapolis, Indiana

# ɪɴ ᴛʜᴇ
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| James Willie Tabb,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff.* | June 4, 2019<br><br>Court of Appeals Case No.<br>18A-CR-1886<br><br>Appeal from the Delaware Circuit Court<br><br>The Honorable Thomas A. Cannon, Jr., Judge<br><br>Trial Court Cause No.<br>18C05-1605-F2-4 |

**Robb, Judge.**

# Case Summary and Issues

Following a jury trial, James Tabb was convicted of three counts of dealing in a narcotic drug—one Level 2 felony and two Level 4 felonies. He was sentenced to twenty-nine and one-half years with six years suspended to probation. On appeal of his convictions, Tabb raises two issues: 1) whether the trial court abused its discretion when it admitted evidence found following a police stop; and 2) whether the evidence was sufficient to support his convictions. Concluding the trial court did not err and the evidence is sufficient, we affirm.

# Facts and Procedural History

On April 19 and April 25, 2016, a confidential informant ("CI") working for the Muncie Police Department ("MPD") arranged to buy heroin from Michelle Knight. The CI informed MPD that Knight "was who we were gonna buy off of but [Knight] gets her dope from . . . a subject . . . that she only knows . . . as James and that he drives a blue van." Transcript of Evidence, Volume I at 80. Knight was a heroin addict who purchased heroin "[p]robably every other day or so, sometimes every day, sometimes every other day[.]" Tr., Vol. II at 107. Knight purchased heroin from Tabb for herself and she would sometimes act as a "go between" for Tabb and other buyers. *Id.* at 109.

On April 19, the CI called Knight and asked if Knight could "get a fifty" of heroin for her, meaning fifty dollars' worth of heroin. *Id.* at 112-13. Knight called Tabb and asked him to bring the heroin to her. The CI came to Knight's

apartment to await the delivery and drove Knight to a nearby gas station where Knight bought a soda. They then returned to the parking lot of Knight's apartment until a blue van arrived. When Tabb arrived, Knight "got in the van[,] . . . [Tabb] handed [a bag] to me, . . . I took what I wanted out of it and sealed it back, and then I got out of the van and gave it" to the CI. *Id.* at 116. Officer Bret Elam was conducting surveillance of the controlled buy and he observed that while Knight and the CI waited in the parking lot for Tabb to arrive, several other people were milling about the area. When the van pulled in, those people lined up at the passenger side window. After Knight left the van, the people in line "would go to the window and as they would walk away from the window the next person would go to the window[.]" Tr., Vol. I at 206. Officer Elam contacted his supervisor who was going to stop the van when it left the parking lot, but the supervisor got a flat tire and the stop was never made.

[4] On April 25, the CI again called Knight and asked if she could get some heroin. The CI told MPD that Knight would have to get the heroin from someone else as before. Knight contacted Tabb and was directed to come to his house. The CI picked up Knight and they went to Tabb's house where they saw Tabb and his associate, William Jackson, carrying grocery bags back and forth from a blue van. Officer Elam and Officer Keith Benbow were conducting surveillance of the controlled buy and also saw Tabb moving between the van and the house. When Tabb was done, he and Knight got into the van, Tabb handed her a bag of heroin, Knight handed him money, took her cut of heroin out of the

bag, and returned to the CI to give her the bag. Knight and the CI then drove back to Knight's apartment. Following the April 25 controlled buy, Officer Tyler Swain and other MPD officers spoke with Knight several times about acting as a confidential informant against Tabb.

[5] In the early morning of May 6, Tabb and Jackson drove from Muncie to Chicago and picked up George Neloms, another associate of Tabb's. Neloms had known Tabb for about thirty years and Jackson for about one year. The three first stopped at a spot Neloms knew as a place to buy or sell drugs because he had bought drugs there before. Tabb exited the van and Neloms saw Tabb speak to a man from whom Neloms had purchased drugs in the past. Tabb then returned to the van, poured some heroin onto a plate, crushed it, and cut it with another substance. The three men snorted the heroin that Tabb prepared before leaving. They then drove to Muncie, stopping at a gas station along the way to get gas and snacks and snort more heroin.

[6] Also on May 6, Knight again met with Officer Swain. While they were together, Knight received a phone call indicating a shipment of heroin was coming into Muncie. Knight did not provide information about who was bringing the drugs or when. Nonetheless MPD wanted to set up a controlled buy using Knight as the CI, but "if we could not get a controlled buy we were at least going to attempt a traffic stop of the shipment." Tr., Vol. I at 98. Officer Elam went to a location near Knight's apartment to conduct surveillance while Officer Swain attempted to pull together a controlled buy. "At that particular point the only plan we had was we'd just go see who it was [bringing the

heroin], what they were driving, and go from there[.]" *Id.* at 212. As Officer Swain drove to Knight's residence, he saw a blue van drive by and relayed that information by police radio. Officer Elam then saw the blue van arrive in the parking lot at Knight's apartment. Knight got into Tabb's van, secured some heroin, and exited. As before, a line of people formed on the passenger side when the van pulled in. When the blue van drove away, Officer Elam lost sight of it. Other officers who had been called to the area located the van and Officer Howell, who was the only officer involved who was in uniform and driving a marked car, conducted a traffic stop.

[7] Officer Howell approached the driver's side of the van and Officer Benbow, who was wearing his police identification on a lanyard around his neck, went to the front passenger window. As Officer Swain approached the van from the passenger side, he saw through tinted windows movement in the back seat: "I could tell it was somebody had made a real furtive movement kind of down[.]" *Id*. at 110. Officer Benbow also saw both the driver and the backseat passenger put their hands down toward the floor despite orders to keep their hands where officers could see them. Officer Swain stepped onto the van's side rail and banged on the backseat side window with his firearm telling the person within to show his or her hands. The van sped off with Officer Swain still standing on the side rail. Officer Swain, holding onto the luggage rack, slid toward the front of the van and was "banging on that window as hard as [he could] to get him to stop," but at a certain point, feeling endangered, he opened fire, shooting out the front passenger side window. *Id.* at 132. Jackson, who was driving, was hit

in the arm by the gunfire. The van swerved and Officer Swain was thrown from side of the van.

[8] In the meantime, the other officers were in pursuit of the fleeing van. As Jackson turned a corner, Neloms tumbled out of the van, along with some items from the van. Officer Benbow stopped his pursuit of the van to attend to him, finding Neloms' wallet, a phone, various other personal items, and three bags of heroin in the grass near him. The heroin weighed nearly thirty grams. Neloms admitted to Officer Benbow that he had recently used heroin but denied that the heroin found nearby was his. Instead, Neloms said, the drugs in the van were controlled solely by Tabb, who had purchased and distributed it.

[9] Jackson brought the van to a stop in the middle of the street and he and Tabb abandoned the van, leaving it running with the doors open. Officer Elam and Officer Howell chased after Tabb, telling him numerous times to get on the ground and show his hands. Instead, Tabb tried to hide behind a parked car. Officer Elam took Tabb to the ground with a front kick and handcuffed him. Officer Howell later found Jackson, bleeding from his arm, propped up against the wall of a nearby house. With MPD having secured the van's occupants, the Indiana State Police ("ISP") were called to the scene. ISP Crime Scene Investigator Kris Martin took pictures of the scene, specifically of the area around where the van was abandoned and Neloms was found on the ground. On May 7, ISP Officer John Petro, pursuant to a search warrant, searched the blue van which had been towed from the scene. He found more heroin divided into individual bags, a pill crusher, and baggies.

[10]     The State charged Tabb with Count 1, dealing in a narcotic drug as a Level 2 felony and Count 2, possession of a narcotic drug as a Level 3 felony, for the events of May 6; Count 3, dealing in a narcotic drug as a Level 5 felony for the April 19 controlled buy; and Count 4, dealing in a narcotic drug as a Level 5 felony for the April 25 controlled buy. The State also filed a notice of intent to seek an enhanced penalty on Counts 3 and 4 due to a prior conviction.

[11]     During the trial, the State called Officer Swain as its first witness. When he reached the point in his testimony that the MPD had stopped the blue van on May 6, Tabb objected "to any further testimony concerning the traffic stop or anything that happened as a result of this traffic stop, I don't believe at this point that it's supported by probable cause, at this point there is no indication whatsoever that criminal activity—there was reasonable suspicion of criminal activity at this time, . . . and that therefore it would be a violation of the – of my client's fourth amendment rights to be free of unreasonable search and seizure[.]" Tr., Vol. I at 104-05. The trial court overruled the objection as premature, but the trial court noted the defense's continuing objection to that issue. Nonetheless, the defense stated "no objection" each time an item found in or near the van was introduced into evidence. *See, e.g.*, *id.* at 147-49 (State offers heroin found near road into evidence); *id.* at 150-51 (State offers laboratory report identifying heroin); *id.* at 178 (State offers heroin found in van); and *id.* at 178-79 (State offers pill crusher).

[12]     The jury returned verdicts of guilty on Counts 1, 3, and 4 but was unable to reach a verdict as to Count 2, the possession of a narcotic drug charge. The

trial court declared a mistrial as to that count. Tabb then admitted to the allegation that he had a prior felony conviction for dealing in a narcotic drug and the trial court entered judgment of conviction on Counts 3 and 4 as Level 4 felonies. Tabb was sentenced to a total of twenty-nine and one-half years. He now appeals his convictions. Additional facts will be provided as necessary.

# Discussion and Decision

## I. Admission of Evidence[1]

### A. Standard of Review

A trial court has broad discretion in ruling on the admissibility of evidence, and we review the admission of evidence for an abuse of discretion. *Guilmette v. State*, 14 N.E.3d 38, 40 (Ind. 2014). We will reverse only when admission of the evidence is clearly against the logic and effect of the facts and circumstances before the court and the error affects a party's substantial rights. *Id.* The ultimate determination of the constitutionality of a search or seizure is a question of law that we consider de novo. *Carpenter v. State*, 18 N.E.3d 998, 1001 (Ind. 2014). However, we do give deference to the trial court's determination of the facts, which will be overturned only if clearly erroneous.

---

[1] Tabb phrases his issue as whether the trial court erred in denying his "Motion to Suppress the fruits of a search resulting from the stop of a motor vehicle[.]" Brief of Defendant-Appellant at 4. However, as noted by the trial court when Tabb objected to the introduction of certain evidence during the trial, Tabb did not file a pre-trial motion to suppress. *See* Transcript of Evidence, Volume I at 107 (Tabb's counsel affirming the trial court's recollection that no motion to suppress had been filed). The issue is therefore whether the trial court erred in admitting that evidence at trial.

*Campos v. State*, 885 N.E.2d 590, 596 (Ind. 2008). Therefore, we do not reweigh the evidence, but consider conflicting evidence most favorably to the trial court's decision. *Id.*

## B. Evidence Arising from the Stop

Tabb argues the trial court erred in admitting evidence obtained as a result of the traffic stop on May 6, 2016. Specifically, he argues that the police "lacked probable cause to detain Tabb and to search the vehicle in which he was a passenger." Br. of Defendant-Appellant at 8.

Tabb's objection at trial was that the police did not have reasonable suspicion to *stop* the van in which he was a passenger and that all evidence procured after the unreasonable stop should be excluded. *See* Tr., Vol. I at 104-05. On appeal, Tabb seems to have changed tack, as he cites *Arizona v. Gant*, 556 U.S. 332 (2009), for the proposition that the *search* of the van was unreasonable because he "was secured and not within reaching distance of a passenger compartment at the time of the search." Br. of Defendant-Appellant at 9. *Gant* is distinguishable.

In *Gant*, the defendant was arrested for driving with a suspended license, handcuffed, and secured in the back of a police car. Police officers then searched his car and found drugs in the pocket of a jacket located on the backseat. The State offered as a justification for the warrantless search that it was a search incident to arrest. The Supreme Court rejected that argument in part because the defendant could not have accessed his car to retrieve weapons

or conceal evidence at the time of the search. *Id.* at 335. The Court also noted that although "circumstances unique to the automobile context justify a search incident to arrest when it is reasonable to believe that evidence of the offense of arrest might be found in the vehicle[,]" that possibility did not justify the search in *Gant* because police could not expect to find evidence of driving while suspended in the passenger compartment of his car. *Id.* (citing *Thornton v. United States*, 541 U.S. 615, 632 (2004)). Thus, the search of the defendant's car was unreasonable. *Id.* at 351; *see also Hathaway v. State*, 906 N.E.2d 941, 945 (Ind. Ct. App. 2009) (citing *Gant* in holding warrantless search of defendant's vehicle was unreasonable when the stop was premised on failing to properly signal a turn and having windows that were tinted too dark and the driver was out of the car and under arrest for driving while suspended when the search was conducted because there was no need to search the car to find and preserve evidence connected to the crime of driving while suspended), *trans. denied*.

[17]  Here, the stop was initiated on the suspicion that the occupants were dealing drugs out of the van and it was therefore reasonable to believe the van contained evidence of that offense. But the more crucial distinction between this case and *Gant* is that the on-site search in this case was limited to items found in open view on the ground around the scene; the search of the van was conducted a day later pursuant to a search warrant.[2]

---

[2] Officer Petro clearly stated at trial that "[o]n the following day, on May 7, 2016, I served a search warrant on a vehicle that was located at the second crime scene[.]" Tr., Vol. I at 167. The "second crime scene" he

[18]     As for the stop itself, the Fourth Amendment permits an officer to "stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot, even if the officer lacks probable cause." *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (internal quotation omitted).  Here, the police had reasonable suspicion supported by articulable facts that criminal activity might be afoot on May 6.  A CI working with MPD told officers that her contact was Knight but that Knight gets her drugs from someone named James who drives a blue van.  On two occasions prior to May 6, officers surveilling a controlled buy saw Knight enter a blue van and exit with heroin that she passed on to the CI.  On one of those occasions, officers saw a line of people form at the blue van and after Knight left the van, those people went one at a time to the window for a few seconds and when they walked away, the next person stepped up to the window.  On May 6, officers learned from Knight that a shipment of heroin was headed to Muncie.  A short time later, officers saw the blue van pull into Knight's parking lot, saw Knight get into and out of the van, and again saw a line of people form at the passenger side, like when "the ice cream truck pulls in, the whole neighborhood flocks to the van."  Tr., Vol. I at 212.  Thus, the stop immediately after the van left the parking lot was supported by reasonable suspicion, as the facts known to the officers at the time of the stop, "together with the reasonable

referred to was the scene where the van had been abandoned in the street on May 6 and had been photographed by Officer Martin on that date.  However, neither party in its brief acknowledges that a search warrant was procured for the search of the van or addresses how that impacts the analysis.

inferences arising from such facts, would cause an ordinarily prudent person to believe that criminal activity has occurred or is about to occur." *State v. Gladney*, 793 N.E.2d 264, 268 (Ind. Ct. App. 2003), *trans. denied*. In other words, the information available to the police at the time of the stop caused them to reasonably believe the van was being used to store and deal drugs.

[19] During the stop, the occupants of the van did not comply with police orders, officers saw furtive movements within the van, and the van ultimately drove away. When the van finally came to a stop, Tabb ran away and tried to hide. Both flight and furtive gestures are suspicious behaviors. *See Person v. State*, 764 N.E.2d 743, 748 (Ind. Ct. App. 2002) (noting unprovoked flight upon noticing the police is certainly suggestive of wrongdoing) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000)), *trans. denied*; *Walls v. State*, 714 N.E.2d 1266, 1267 (Ind. Ct. App. 1999) (noting furtive movements, among other things, are suspicious behaviors), *trans. denied*. And finally, when Neloms was thrown from the van, bags of heroin fell out with him. Officers had probable cause at that point to believe the van contained additional contraband. And yet, they waited to search the van until the next day after procuring a warrant. Neither the stop nor the search violated Tabb's Fourth Amendment rights.[3]

---

[3] Tabb briefly invokes Article 1, section 11 of the Indiana Constitution in his brief, but as he made no state constitutional argument at trial, he has waived any such argument on appeal. *See Negash v. State*, 113 N.E.3d 1281, 1290 (Ind. Ct. App. 2018) (holding defendant waived state constitutional claim because "[i]t is well-settled in Indiana that a defendant may not argue one ground for objection at trial and then raise new grounds on appeal").

# II. Sufficiency of the Evidence

## A. Standard of Review

[20] When reviewing the sufficiency of the evidence required to support a criminal conviction, we do not reweigh the evidence or judge the credibility of the witnesses. *Bailey v. State*, 907 N.E.2d 1003, 1005 (Ind. 2009). We consider only the evidence supporting the verdict and any reasonable inferences that can be drawn therefrom. *Morris v. State*, 114 N.E.3d 531, 535 (Ind. Ct. App. 2018), *trans. denied.* Thus, we consider conflicting evidence most favorably to the verdict. *Silvers v. State*, 114 N.E.3d 931, 936 (Ind. Ct. App. 2018). "We will affirm if there is substantial evidence of probative value such that a reasonable trier of fact could have concluded the defendant was guilty beyond a reasonable doubt." *Bailey*, 907 N.E.2d at 1005. It is not necessary for the evidence to overcome every reasonable hypothesis of innocence; it is sufficient if an inference may reasonably be drawn from the evidence to support the verdict. *Silvers*, 114 N.E.3d at 936.

## B. Evidence of Dealing

[21] Tabb was convicted of Count 1, possessing at least ten grams of heroin with intent to deliver on May 6, 2016; Count 3, knowingly or intentionally delivering heroin on April 19, 2016; and Count 4, knowingly or intentionally delivering heroin on April 25, 2016. He argues the evidence was insufficient to find him guilty because the "only evidence directly implicating Tabb in the alleged drug deals of April 19 and April 25, 2016 was the vague testimony of Michelle

Knight," and her testimony was inherently unreliable because she is an admitted drug addict and was granted leniency in her own criminal case for her testimony against Tabb. Br. of Defendant-Appellant at 11. He also argues the testimony of Neloms was vague and "replete with inconsistencies and contradictions." *Id.*

[22] The State's evidence showed Tabb was in constructive possession of nearly thirty grams of heroin on May 6, and that he had baggies and a pill crusher for dividing and distributing the heroin. The evidence further showed that he actually did deliver some of the heroin on that date to Knight. The State's evidence also showed that on April 19 and 25, he delivered heroin to Knight that she in turn passed along to a CI.

[23] Tabb's argument is a request that we reweigh the evidence and find Knight and Neloms' testimony lacking. However, the credibility of witnesses is left to the jury and we do not reweigh the evidence or judge the credibility of the witnesses for ourselves. *See Bailey*, 907 N.E.2d at 1005. Moreover, Knight's addiction and her arrangement for testifying were squarely before the jury and they chose to credit her testimony, as is their prerogative. And as to Neloms' allegedly inconsistent and contradictory testimony, to the extent Tabb is attempting to claim his testimony is incredibly dubious, the argument is waived as he has failed to develop this challenge. *See* Ind. Appellate Rule 46(A)(8)(a); *Burnell v. State*, 110 N.E.3d 1167, 1171 (Ind. Ct. App. 2018). Furthermore, as Neloms' was not the sole witness, the incredible dubiosity rule is inapplicable. *See Moore*

*v. State*, 27 N.E.3d 749, 756 (Ind. 2015). The evidence produced by the State is sufficient to support his convictions.

# Conclusion

[24] The trial court did not err in admitting evidence arising from the stop and search that occurred on May 6, 2016, and the State presented sufficient evidence to prove beyond a reasonable doubt that Tabb committed the crimes alleged. Tabb's convictions are therefore affirmed.

[25] Affirmed.

Baker, J., and Najam, J., concur.