# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Nov 06 2020, 8:29 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Nathan D. Meeks
Marion, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Josiah Swinney
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| John Wesley Ewing, *Appellant-Defendant,* | November 6, 2020 |
| v. | Court of Appeals Case No. 19A-CR-3023 |
| | Appeal from the Grant Superior Court |
| State of Indiana, *Appellee-Plaintiff,* | The Honorable Dana J. Kenworthy, Judge |
| | Trial Court Cause No. 27D02-1604-F2-3 |

**Robb, Judge.**

# Case Summary and Issues

[1] Following a jury trial, John Ewing was convicted of dealing in a narcotic drug, a Level 2 felony, and admitted to being an habitual offender. The trial court sentenced Ewing to serve an aggregate sentence of forty years. Ewing now appeals and raises two issues for our review: (1) whether the trial court abused its discretion in admitting evidence discovered pursuant to a search warrant; and (2) whether the evidence is sufficient to support his conviction for dealing in a narcotic drug. Concluding the trial court did not abuse its discretion in admitting the evidence and the evidence is sufficient to support Ewing's conviction, we affirm.

# Facts and Procedural History

[2] After receiving a tip that Ewing was dealing narcotics out of his home in Upland, Indiana, detectives with the Joint Effort Against Narcotics ("JEAN") Team Drug Task Force began investigating and conducted surveillance on Ewing. On March 24, 2016, JEAN task force Detective Wesley McCorkle prepared a probable cause affidavit to obtain a search warrant for Ewing's residence. The reasons and grounds provided, in part:

> 1. On 7/21/15 the JEAN Team Drug Task Force received a tip about . . . Ewing, also known as "Black," dealing illegal narcotics at [a residence on] E. 400 S. [in] Upland, Indiana[.]
>
> 2. On 11/22/15 an interview was conducted with [B.K. who said he] was getting illegal narcotics from . . . Ewing who lives in

the country by Upland. [B.K.] said Mr. Ewing is from Muncie
and drives a white Jeep Liberty. [B.K.] was asked if he has seen
"kilos" of illegal narcotics at Mr. Ewing's residence and [he] said
that he has[.]

3.    On 11/23/15 Detective Josh Zigler spoke with Detective
Mike Nickens of the Muncie Drug Task Force in reference to . . .
Ewing. Det. Nickens advised Det. Zigler that he was familiar
with Mr. Ewing [and] Ewing is originally from Muncie, . . . and
he now lives somewhere near Upland[,] goes by the street name
"Black" and there were several individuals in Muncie . . .
obtaining illegal narcotics from him[, and] Ewing comes to
Muncie on a daily or every other day basis. Det. Nickens was
familiar with Mr. Ewing driving a white Jeep.

4.    On December 23rd 2016 a GPS tracker was affixed to . . .
Ewing's white Jeep Liberty[.]

[Appellant's] Appendix ("Appellant's App."), Volume 2 at 134-35.

[3]    In the affidavit, Detective McCorkle also attested that on January 8, 2016, he
and other task force detectives were conducting surveillance in the area of
Ewing's house and observed Ewing drive a white Jeep Liberty. Detectives
followed Ewing as he drove to Hartford City and then to Muncie. They
decided to return to Grant County but continued to monitor Ewing's location
via GPS, which revealed that Ewing drove to Atlanta, Georgia, where he
stayed for eleven minutes. The detectives coordinated with the task force and
the Indiana State Police to initiate a traffic stop on Ewing when he drove back
into Indiana. Detectives McCorkle and Zigler located the vehicle in
Connersville and began to follow it. Two state troopers pulled the vehicle over

for speeding. Ewing's brother was seated in the driver's seat and Ewing was seated in the front passenger seat. Ewing was asked to retrieve the vehicle registration and a clear plastic bag containing a "green leafy plantlike material" fell out of the glove box. *Id.* at 135. Ewing stated that he "smokes weed and that the marijuana that was in the glove box was his personal use." *Id.* at 136. The troopers and Detective McCorkle searched the vehicle but did not locate any other evidence of a crime. Ewing's brother was given a warning for speeding and Ewing was advised he would receive an order to appear due to the marijuana found in the vehicle.

[4] Detective McCorkle also provided the following information in his affidavit:

> 6. Throughout the month of February and March of 2016 both the Muncie Drug Task Force and the JEAN Team Drug Task Force has received phone calls from an anonymous female that has advised us that John "Black" Ewing has been selling a large quantity of heroin both in Muncie and from his residence.

> 7. Through surveillance Mr. Ewing has been seen walking to and from the residence and the woods just south of [his] residence. Information has been received by the JEAN Team D.T.F. that Mr. Ewing raises pitbulls in the wooded area behind his house and I believe that area could be used to hide contraband and/or U.S. Currency related to the sale of drugs.

*Id.* And finally, Detective McCorkle provided the details of a controlled buy on March 22. A confidential informant ("CI") contacted Detective McCorkle "in reference to purchasing heroin from an individual [the CI] knew as 'Black.'" *Id.* Detective McCorkle was familiar with the CI from prior investigations

regarding Ewing; he contacted the task force to set up the buy and obtained audio and video recording devices. The CI spoke with Ewing via cell phone and agreed to purchase three grams of heroin for $300.

[5] Detectives McCorkle and Zigler photocopied the buy money, met with the CI, provided the buy money, and conducted a "debrief." *Id*. The CI advised detectives that he/she would call Ewing, let him know he/she had the money, and find out where to meet him. The CI told the detectives he/she believed the buy would take place at Ewing's house because that is where he/she normally purchases from Ewing. The CI also stated he/she has purchased heroin from Ewing in his detached garage in the past. The CI called Ewing, who said to meet him at a local gas station.

[6] Detective Zigler advised Detective McCorkle that he observed, via a hidden camera, a red vehicle leave Ewing's residence. Detectives followed the CI to the gas station and conducted surveillance. The CI parked, waited a few minutes, and then called Ewing several times without answer. Several minutes later, a red Pontiac Grand Prix pulled into the parking lot of the gas station and parked north of the CI. The CI exited the vehicle, walked to the passenger side of the red car, stayed there for about one minute, and then returned to his/her vehicle. The red car then drove away. The detectives followed the CI back to their original meeting location and the CI provided the substance he/she had purchased. A post-buy debrief was conducted during which the CI informed the detectives that he/she observed a red Pontiac pull up to his/her vehicle at the gas station; the CI recognized the subject in the Pontiac as Ewing's uncle

and described him as a black male in his fifties with several missing teeth; the CI walked over to the Pontiac, handed Ewing's uncle the $300 buy money, and "was handed a clear twisted and knotted plastic baggy that contained a tan rock like substance" he/she believed to be heroin. *Id.* at 137.

[7] The substance weighed 3.2 grams and field tested positive for heroin. Detective Zigler subsequently informed Detective McCorkle that he drove to County Road 400 S and observed a red Pontiac Grand Prix parked in the driveway of Ewing's residence and observed two black males get out of the vehicle. The passenger was wearing tan clothing and the vehicle had a temporary plate. Detective McCorkle attested that all video and audio, including pre- and post-buy interviews and footage of the red Pontiac leaving and returning to Ewing's residence, were burned to a disc. Based on the information provided in the affidavit, a search warrant was issued on March 24.

[8] Later that night, a SWAT team and detectives from the task force executed the search warrant. During the search, officers located a total of approximately 369 grams of heroin, baggies, a Direct TV bill addressed to Ewing, a "dried green plant like material" inside a Mason jar in the kitchen cabinet, a digital scale with "a smear of white powder on it[,]" measuring cups with powder residue, a razor blade, and multiple firearms, including an AR-15-style long rifle. Transcript of Evidence, Volume 3 at 23-24. Ewing and his son, who was also living at the house, were taken into custody.

[9] Later, police interviewed Ewing. When asked how much heroin was in the house, Ewing responded, "about three hundred and some grams." Exhibits, Volume 4 at 99. And officers also asked how much money he "[gave] out when you re-upped?" to which Ewing responded, "about fifteen grand." *Id.* During the interview, Ewing said he usually sells marijuana or cocaine but began selling heroin "because it was faster money[,]" he purchases heroin already cut, and his son was not involved. *Id.* at 110.

[10] Based on evidence seized as a result of the March 24 warrant, two other search warrants were later issued. On March 25, officers obtained a warrant to search the residence, detached garage, shed, fenced area used for kenneling dogs, and two vehicles for proceeds from the illegal sales of heroin or other narcotics. *See* Appellant's App., Vol. 2 at 144-45.[1] Another warrant was issued on March 31 to search the contents of Ewing's cell phones.

[11] On April 1, the State charged Ewing with Count I, dealing in a narcotic drug, a Level 2 felony; Count II, conspiracy to commit dealing in a narcotic drug, a Level 5 felony; Count III, maintaining a common nuisance, a Level 6 felony;

---

[1] The same day, the warrant was amended to allow officers to search for contraband related to illegal dog fighting. *See id.* at 148.

Count IV, possession of marijuana, a Class A misdemeanor; and alleged Ewing was an habitual offender.[2]

[12]    In April 2017, Ewing challenged the validity of the three search warrants by filing a motion to suppress all evidence obtained as a result of the search warrants, any statements made by Ewing, and jails calls from Ewing's arrest. Ewing argued that the March 24 warrant was based on unreliable and uncorroborated hearsay and the officers were "reckless and grossly negligent in preparing the [March 24] affidavit" and "could not have harbored an objectively reasonable belief in the existence of probable cause to search the residence and grounds for evidence of drug contraband, drug money and drug paraphernalia." *Id.* at 158-59. He also argued the warrants were stale. Following a hearing, the trial court issued an order denying Ewing's motion to suppress and finding that probable cause existed for the issuance of the search warrants. *See id.* at 198.

[13]    The State moved to dismiss Counts II-IV, which the trial court granted, leaving only Count I, dealing in a narcotic drug, a Level 2 felony. A jury trial was held on May 14, 2019. Ewing made a continuing objection to the evidence obtained as a result of the search warrant, which the trial court overruled. Notably, at trial, the CI testified that he/she lied to police and never purchased drugs from

---

[2] Later, the State also charged Ewing with an additional seventy-two counts of various animal cruelty crimes related to over thirty dogs found in kennels on his property. These charges were later dismissed, some of which were dismissed without prejudice.

Ewing. *See* Tr., Vol. 3 at 103, 107. The CI acknowledged telling Detective McCorkle he/she spoke to Ewing and Ewing was going to sell heroin to him/her at the gas station. But when asked if the CI was lying to the detective, the CI stated, "Yeah, I did. . . . I wanted to stay out [of jail and] they wanted [Ewing]." *Id.* at 106.

[14] Following the presentation of evidence, the jury found Ewing guilty as charged. In the second phase of trial, Ewing admitted to being an habitual offender. The trial court sentenced Ewing to forty years, thirty-eight years to be executed in the Indiana Department of Correction and two years suspended to probation. Ewing now appeals. Additional facts will be supplied as necessary.

# Discussion and Decision

## I. Admission of Evidence

[15] Ewing argues that the trial court erred in admitting evidence obtained as a result of the search warrant that "was supported by uncorroborated hearsay [and] an inadequate controlled buy" and therefore lacked probable cause. Brief of Appellant at 8. We disagree.

### A. Standard of Review

[16] Our standard of review in this area is well-settled. The admission and exclusion of evidence falls within the sound discretion of the trial court, and we review the trial court's decision for an abuse of that discretion. *Morrison v. State*, 824 N.E.2d 734, 739 (Ind. Ct. App. 2005), *trans. denied*. An abuse of discretion

occurs when the trial court's decision is clearly against the logic and effect of the facts and circumstances before it. *Baker v. State,* 997 N.E.2d 67, 70 (Ind. Ct. App. 2013). We do not reweigh the evidence and consider the evidence most favorable to the trial court's ruling. *Scott v. State*, 883 N.E.2d 147, 152 (Ind. Ct. App. 2008).

## B. Probable Cause to Search Residence

[17] The Fourth Amendment to the United States Constitution and Article 1, section 11 of the Indiana Constitution both require probable cause for the issuance of a search warrant. *Rader v. State*, 932 N.E.2d 755, 758 (Ind. Ct. App. 2010), *trans. denied*. "Probable cause is a fluid concept incapable of precise definition and must be decided based on the facts of each case." *Id.* "Ultimately, the task of a magistrate in deciding whether to issue a search warrant is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *McGrath v. State*, 95 N.E.3d 522, 528 (Ind. 2018) (internal quotation omitted). When reviewing a magistrate's decision to issue a warrant, we apply a deferential standard. *Newby v. State*, 701 N.E.2d 593, 598 (Ind. Ct. App. 1998). We evaluate whether the reasonable inferences drawn from the totality of the evidence support the probable cause finding. *McGrath*, 95 N.E.3d at 528. "Rather than consider *post hoc* justifications for the search, we evaluate only the evidence presented to the issuing magistrate." *Id.*

[18]     "Probable cause to issue a search warrant cannot be supported by uncorroborated hearsay from an informant whose credibility is unknown." *Scott*, 883 N.E.2d at 154 (quotation omitted). Indiana Code section 35-33-5-2(b) provides that when an affidavit is based on hearsay, it must either:

> (1) contain reliable information establishing the credibility of the source and of each of the declarants of the hearsay and establishing that there is a factual basis for the information furnished; or

> (2) contain information that establishes that the totality of the circumstances corroborates the hearsay.

[19]     The reliability of hearsay may be established if: (1) the informant has given correct information in the past; (2) independent police investigation corroborates the informant's statements; (3) some basis for the informant's knowledge is demonstrated; or (4) the informant predicts conduct or activities by the suspect that are not ordinarily predictable. *Cheever-Ortiz v. State*, 825 N.E.2d 867, 872 (Ind. Ct. App. 2005). Other considerations may come into play in establishing the reliability of the informant or the hearsay. *Id.* And an anonymous tip alone cannot provide the basis for probable cause; however, an anonymous tip, along with a showing of a basis for the informant's knowledge and corroboration by independent police work, will support probable cause. *Id.* at 873.

[20]     Here, the affiant attested to the following information in the probable cause affidavit:

- Police received a tip that Ewing, known as "Black," was dealing narcotics at his residence located on E. 400 S. in Upland.

- B.K. told police he purchased narcotics from Ewing at Ewing's residence in Upland; he has seen "kilos" of illegal narcotics at Ewing's house; and Ewing is from Muncie and drives a white Jeep. Appellant's App., Vol. 2 at 135.

- Detective Nickens of the Muncie Drug Task Force informed detectives he was familiar with Ewing; Ewing is from Muncie but lives near Upland; Ewing's street name is "Black"; several individuals in Muncie have purchased narcotics from Ewing; Ewing drives a white Jeep; and drives to Muncie every day or every other day.

- Police obtained a warrant, placed a GPS tracker on Ewing's white Jeep Liberty, and monitored his movement.

- In January 2016, detectives observed a white Jeep Liberty leave the residence, followed it, and later identified Ewing as the driver. Detectives followed the vehicle to Muncie, where Ewing made several stops, but then returned to Grant County and continued to monitor Ewing's location. Ewing then traveled to Atlanta, stayed there for eleven minutes, and returned home.

- Detectives coordinated a traffic stop upon Ewing's return to Indiana. Ewing's brother was the driver; Ewing was the passenger. During the

stop, marijuana fell from the glove box and officers conducted a search, which did not reveal any valuable evidence. Ewing admitted the marijuana was for his personal use.

- In February and March 2016, the Muncie Drug Task Force and JEAN Drug Task Force received phone calls from an anonymous female advising police that "John 'Black' Ewing has been selling a large quantity of heroin both in Muncie and from his residence." *Id.* at 136.

- Surveillance has shown Ewing walk to and from his residence and the woods near his residence.

- On March 22, 2016, a CI informed police that he/she spoke with an individual he/she knew as "Black," who agreed to sell the CI three grams of heroin for $300. Police organized a controlled buy, utilizing adequate controls. The CI believed the meeting location would be Ewing's residence as it was where the CI would normally purchase from Ewing. The CI called Ewing, who asked to meet at a gas station. After the call, another detective observed a red passenger vehicle leave Ewing's residence. Police followed the CI to the gas station. A red Pontiac Grand Prix pulled up next to the CI, the CI walked over to the car, purchased heroin from a man the CI recognized as Ewing's uncle, and then returned to his/her vehicle. The Pontiac left the parking lot. Shortly after the buy, Detective Zigler drove to Ewing's residence and

observed two black males get out of a red Pontiac Grand Prix in the driveway.

[21] The totality of the circumstances provided in this affidavit corroborates the tips and information provided by the informants. Over the course of months, detectives received several anonymous tips, information from two named individuals, B.K. and the CI, and Muncie narcotics detective Nickens that Ewing was selling illegal narcotics out of his residence. *See Beverly v. State*, 801 N.E.2d 1254, 1262 (Ind. Ct. App. 2004) (citing *United States v. Schaefer*, 87 F.3d 562, 566 (1st Cir. 1996) ("Courts often have held that consistency between the reports of two independent informants helps to validate both accounts.")), *trans. denied*. B.K. told detectives he had been to Ewing's residence where he purchased drugs from Ewing and *personally observed* large quantities of narcotics inside the house. And the anonymous tips also identified Ewing's nickname and one tip provided Ewing's exact address.

[22] Ewing claims that the independent police investigation did not corroborate the information the CI provided to police, who later admitted that he/she lied to police and never purchased drugs from Ewing. However, we conclude that the independent police investigation, including the controlled buy, supports the reliability of the tips and information provided by the informants. Although the controlled buy did not take place at Ewing's residence, the CI contacted Ewing to purchase three grams of heroin. Shortly after the call, detectives observed the seller travel from Ewing's residence to the gas station, conduct the transaction, and return to the residence after the sale. And the fact that the CI later said

he/she was lying is irrelevant to the instant analysis because that was unknown to police at the time the affidavit was submitted and we evaluate only the evidence presented to the issuing judicial officer. *See McGrath*, 95 N.E.3d at 528.

[23] We conclude the affiant provided a substantial basis to establish probable cause to believe Ewing was dealing heroin from his residence and therefore, the warrant to search his residence for evidence of this crime was valid. Because the warrant was valid, the evidence discovered during the execution thereof and pursuant to the subsequent warrants was properly admitted and the trial court did not abuse its discretion in this regard.

## C. Good Faith Exception to the Exclusionary Rule

[24] Ewing also contends that "the good faith exception could not apply because it was patently obvious that probable cause did not exist" and therefore, the evidence should have been suppressed. Br. of Appellant at 8. Having already determined the warrant was valid, an analysis of this exception is unnecessary. However, for the sake of thoroughness, we briefly address Ewing's argument.

[25] In *United States v. Leon*, 468 U.S. 897 (1984), the United States Supreme Court held that the exclusionary rule does not require the suppression of evidence obtained in reliance on an invalid or defective search warrant if the police relied on the warrant in objective good faith. *Jaggers v. State*, 687 N.E.2d 180, 184 (Ind. 1997). The good faith exception does not apply if (1) the judicial officer issuing the warrant was misled by information in the affidavit that the affiant

knew was false; (2) the judicial officer issuing the warrant wholly abandoned the detached and neutral judicial role; (3) the affidavit supporting the warrant was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; or (4) the warrant is so facially deficient that the executing officers could not reasonably presume it to be valid. *Rice v. State*, 916 N.E.2d 296, 301-02 (Ind. Ct. App. 2009), *trans. denied*.

[26] Indiana has codified the "good faith exception" to the exclusionary rule in Indiana Code section 35-37-4-5, which provides, in part, that evidence is obtained in good faith if it is obtained pursuant to "a search warrant that was properly issued upon a determination of probable cause by a neutral and detached magistrate, that is free from obvious defects *other than nondeliberate errors made in its preparation*, and that was reasonably believed by the law enforcement officer to be valid[.]" Ind. Code § 35-37-4-5(b)(1)(A) (emphasis added).

[27] Here, there is no claim that the warrant was facially deficient, that the issuing magistrate was not detached and neutral, or that the officers misled the issuing magistrate by knowingly providing false information. Instead, Ewing claims that the police clearly lacked any probable cause, which they should have known. The detectives conducted independent investigation to corroborate the information they received. They executed a controlled buy and had no information at the time of applying for the warrant that would cast doubt on the accuracy of the CI's information, which was consistent with the other tips and information they previously obtained. We cannot conclude the search warrant

was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable. Therefore, assuming arguendo that the warrant was not valid, the "good faith exception" to the exclusionary rule would apply and the evidence was properly admitted.

## II. Sufficiency of the Evidence

[28] Ewing argues there is insufficient evidence to support his conviction because only half of the suspected heroin was tested; police investigation and surveillance did not reveal a drug deal, any unusual traffic patterns, or any evidence he was dealing; the controlled buy did not involve Ewing; and the CI testified that he/she lied and had never purchased drugs from Ewing. We conclude there is sufficient evidence to support Ewing's conviction.

### A. Standard of Review

[29] When reviewing the sufficiency of the evidence required to support a criminal conviction, we do not reweigh the evidence or judge the credibility of the witnesses. *Bailey v. State*, 907 N.E.2d 1003, 1005 (Ind. 2009). Instead, we consider only the evidence supporting the verdict and any reasonable inferences that can be drawn therefrom. *Morris v. State*, 114 N.E.3d 531, 535 (Ind. Ct. App. 2018), *trans. denied*. And we consider conflicting evidence most favorably to the verdict. *Silvers v. State*, 114 N.E.3d 931, 936 (Ind. Ct. App. 2018). "We will affirm if there is substantial evidence of probative value such that a reasonable trier of fact could have concluded the defendant was guilty beyond a reasonable doubt." *Bailey*, 907 N.E.2d at 1005. It is not necessary for the

evidence to overcome every reasonable hypothesis of innocence; it is sufficient if an inference may reasonably be drawn from the evidence to support the verdict. *Silvers*, 114 N.E.3d at 936.

## B.  Dealing in a Narcotic Drug

[30]  To convict Ewing, the State was required to prove each element of dealing in a narcotic drug beyond a reasonable doubt. Ind. Code § 35-41-4-1(a). A person who possesses, with intent to deliver, a narcotic drug in an amount of at least ten grams commits dealing in a narcotic drug, a Level 2 felony. Ind. Code §§ 35-48-4-1(a)(2), (e)(1) (2014).[3] Because intent is a mental state, a trier of fact must generally resort to the reasonable inferences arising from the surrounding circumstances to determine whether the requisite intent exists. *McGuire v. State,* 613 N.E.2d 861, 864 (Ind. Ct. App. 1993), *trans. denied.* This court has held that "[c]ircumstantial evidence showing possession with intent to deliver may support a conviction." *Love v. State*, 741 N.E.2d 789, 792 (Ind. Ct. App. 2001) (quotation omitted).

---

[3] Although not raised by either party, we pause to note a few discrepancies in the record with respect to this charge. The caption of the charging information and the abstract of judgment both cite to section (a)(1) of Indiana Code section 35-48-4-1, which provides that a person who knowingly or intentionally manufactures, finances the manufacture of, delivers, or finances the delivery of a narcotic drug commits dealing in a narcotic drug. *See* Appellant's App., Vol. 2 at 22; *id.,* Vol. 3 at 60. However, the substance of the information specifically alleged that Ewing knowingly *possessed with intent to deliver* a narcotic drug, which is consistent with the language in section (a)(2) of the statute, and with the preliminary and final instructions provided to the jury. *See* Appellant's App., Vol. 2 at 22; Exhibits, Vol. 4 at 126-27, 133-34. Therefore, we analyze the sufficiency of the evidence under section (a)(2).

[31] A person has actual possession of contraband when he has direct physical control over it. *Gray v. State*, 957 N.E.2d 171, 174 (Ind. 2011). However, "[a] person constructively possesses contraband when the person has (1) the capability to maintain dominion and control over the item; and (2) the intent to maintain dominion and control over it." *Id.* To prove capability, the State must show that the defendant is able to reduce the contraband to his personal possession. *K.F. v. State*, 961 N.E.2d 501, 510 (Ind. Ct. App. 2012), *trans. denied*. And to prove intent, the State must demonstrate the defendant's knowledge of the presence of the contraband. *Id.* This knowledge may be inferred from either exclusive dominion and control over the premises containing the contraband or, if the control is non-exclusive, evidence of additional circumstances that point to the defendant's knowledge of the presence of the contraband, including incriminating statements made by the defendant; attempted flight or furtive gestures; proximity of contraband to the defendant; location of the contraband within the defendant's plain view; or mingling of the contraband with other items owned by the defendant. *Id.*

[32] Here, officers located an extremely large amount of heroin – approximately 369 grams[4] – inside Ewing's house. The large amount in itself is sufficient to demonstrate possession with intent to deliver. *See Davis v. State*, 791 N.E.2d 266, 270 (Ind. Ct. App. 2003) ("Evidence of the illegal possession of a relatively

---

[4] This is the total weight of the substance located in Ewing's house; however, the Indiana State Police laboratory only tested a portion, 170.03 grams, of the substance, which tested positive for heroin. *See* Tr., Vol. 2 at 246; *id.,* Vol. 3 at 15.

large quantity of drugs is sufficient to sustain a conviction for possession with intent to deliver."), *trans. denied.* However, in the kitchen, police also discovered baggies, a digital scale and measuring cups with white powder residue, and a razor blade. Even though Ewing's son was living in the house at the time, police also discovered a Direct TV bill addressed to Ewing on the kitchen counter and Ewing made incriminating statements. In an interview, Ewing later admitted there was about three hundred grams of heroin in the house for which he paid $15,000. *See* Exhibits, Vol. 4 at 99. Ewing also told detectives he did not use heroin and he usually sells weed or cocaine but began selling heroin "because it was faster money[,]" and his son was not involved. *Id.* at 110. Based on this evidence, the jury could reasonably infer Ewing possessed several hundred grams of heroin with the intent to deal. *See Wilson v. State*, 754 N.E.2d 950, 957 (Ind. Ct. App. 2001) (noting possession of a large quantity of drugs, money, plastic bags, and other paraphernalia is circumstantial evidence of intent to deliver); *see also Love*, 741 N.E.2d at 792 ("The more narcotics a person possesses, the stronger the inference that he intended to deliver it and not consume it personally.").

[33] With respect to Ewing's argument that the CI testified that he/she lied and never purchased drugs from Ewing, this is merely a request for this court to reweigh the evidence, which we cannot do. *See Bailey*, 907 N.E.2d at 1005. We conclude that the jury could have reasonably inferred Ewing's intent to deal heroin from his possession of several hundred grams of heroin and paraphernalia and his admissions to police.

# Conclusion

[34] The trial court did not abuse its discretion in admitting evidence obtained when police executed the search warrant and the evidence is sufficient to support Ewing's conviction for dealing in a narcotic drug. Accordingly, we affirm.

[35] Affirmed.

Crone, J., and Brown, J., concur.